Buford H. FERGUSON, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary, Department of Health, Education and Welfare, Social Security Administration, United States of America, Defendant.

Civ. A. No. 4312.

United States District Court
W. D. South Carolina,
Greenville Division.

Aug. 22, 1964.

Theodore M. Burns, Jr., Greenville, S. C., for plaintiff.

John C. Williams, U. S. Atty. for Western Dist. of South Carolina, and Ernest J. Howard, Asst. U. S. Atty., for defendant.

HEMPHILL, District Judge.

Action originated by claimant to assure entitlement to the establishment of a period of disability and to disability insurance benefits under sections 216(i) and 223(a) of the Social Security Act, as amended.

In the Hearing Examiner's decision dated November 8, 1962 is found the following:

"Claimant's full name is Buford Highler Ferguson; he lives at 529 Fair Street, Anderson, South Carolina. He stated he could not see well enough to tell if the signature on the Form SS–5 was his or not. He was born in Georgia on August 16, 1912, which makes him fifty years old now. He is five feet, seven and one-half inches tall and weighs 160 pounds. He is right-handed, is married and his wife does not work. They have four children at home—two sons and two daughters. The sons were born October 3, 1946, and August 4, 1948; the daughters were born January 24, 1951, and January 27, 1954. They rent a five-room, one-story house with bath. The secretary to his attorney brought the claimant to the hearing. Claimant does not drive but has an unrestricted driver's license. He does not own a car. When he had his driver's license renewed, claimant gave August 16, 1914, as his date of birth. He testified that he does not know how this happened.

"Claimant went to school through the fifth grade in Hollingsworth, Georgia. After he quit school he started farming. He does not know how old he was when he went to work in the mill. He came to South Carolina in 1931; before this he had worked at the Jefferson Mill in Tacoa, Georgia, and at a furniture factory in Tacoa. We went to work at the mill as a sweeper and stated he was just a helper in the flue shop at the furniture factory.

"Claimant thinks he came to Anderson from Tacoa, Georgia, in 1931 and went to work at Orr Cotton Mill. He worked there for one quarter in 1937 and did not work for about three months. Then he went to Lawnsdale Company in Seneca and worked there for about nine months. After this he was off about one year; then he went to work at Equinox Mill for about nine months. He was off again for about one year, then went back to Orr Mill. He did not work very much in 1940 because he only made $15.29 that year. During the first quarter of 1941 he worked at Orr Mill and made $105.00 and $78.-78 the second quarter. Then he was out of work for nine months. During the second quarter of 1941 he went to work at Victor-Monaghan Mill in the card room. During the third quarter of 1941 he worked part of the time for Startex Mill and worked a little for Equinox Mill at Anderson the last three months of that year. The first three months of 1942 he worked for Lawnsdale Company and Victor-Monaghan. He made $9.24 at Lawnsdale and $83.40 at Victor-Monaghan. During the second three months he went to work at Orr Mill and stayed there about nine months. Claimant stated he does not remember why he was out of work so much unless he was sick or because they just could not use him.

"While working at Orr Mill he also did some work at the Gossett Mill in Anderson and at the Appleton Company—he made only $3.90 there (1942). He was paid $15.42 at Gos-

sett. Claimant testified he was trying out different jobs at that time. In 1943 he worked at Orr Mill steadily for nine months and worked a little the last three months; he was apparently also at the Anderson Mill the last three months of 1943. Claimant worked all of 1944 and about six months in 1945 at the Anderson Mill. He was paid $22.66 in the third quarter. He was working at Appleton Company during the second and third quarters of 1946. Claimant worked just a while the first quarter of 1947; then he was laid off for about six months. The latter part of the year he went back to Orr Mill and stayed there all of 1948 and went back to Appleton Company for about five or six months in 1949. Then he went to work at the Piedmont Mercantile Company selling spreads, curtains and things like that; then he did nothing much for nine or ten months. The latter part of 1950 and in 1951 and 1952 the claimant worked fairly regularly at the Townsend Cotton Mill in the card room. He started working for the American Bakeries about the middle of 1953. His job was loading the trucks with bread, cakes and other bakery products. The first six months of 1954 the claimant was out of work. He did work a little in the third quarter of 1954.

"Claimant stated he worked mostly in the card room in the mills. His job was carding and drawing. A card is a blanket of cotton about one-half inch thick. He had to keep the card running and doff it out and push it to the drawing room. Claimant had to lift the laps onto the back; they weighed about forty-two pounds. The machine drew these into ropes about one-half or one inch in diameter. These ropes coil up in a can and he had to take the cans off and push them to the drawing room; he pushed about four cans at one time. He had to put laps on the frame about three or four times a day and he ran about eleven or twelve frames at the Townsend Mill. Claimant stated when his kidney was giving him trouble he had difficulty lifting these laps; it would make him weak and make his back hurt.

"Claimant testified that he has been in the hospital several times. He does not remember when his kidneys started giving him trouble. A report from the Anderson Memorial Hospital states that claimant was diagnosed as having kidney stones in 1952; another report states that claimant had his left kidney removed. (Same hospitalization.) The next hospitalization was from December 26, 1955, to January 6, 1956; this was for operation for hernia which Dr. Martin performed. Both of these reports state that claimant is improved. Claimant stated that Dr. Martin operated on his right kidney to take stones out before that left one was removed. He also said Dr. Martin operated on him two times for hernia on the right side. Dr. Martin reported in March 1956 hernia repaired and recovered. Claimant said no doctor ever told him he had diabetes. He said he has high blood and he cannot eat fats or pork. This started after his kidney was removed. He stated he had a nervous breakdown and his blood went up; he was not in the hospital for the nervous breakdown.

"Claimant has been on Public Welfare since 1952. He gets $81.00 a month for the entire family. He also said the people from the church help them a lot.

"Claimant said he cannot rest or sleep at night for the pain in his back—he has to take medicine to sleep. This has been going on since kidney trouble started. He stated the right side of his head and his right eye hurt continuously. He cannot see out of his right eye and can't see well enough to read out of his left eye. He was wearing glasses

when he got his driver's license renewed but they had not restricted him. He was not examined when he got the license. When he got the renewal form he had to have a doctor sign it. He was told that if he had his glasses changed it would improve his eyesight.

"He testified that his head, ear and eye hurt continuously and sometimes when his blood runs up his face burns like fire. A lot of mornings he feels like the 'meat is crawling on my bones' and he just cannot get himself together. He said all this started right after his kidney was removed. He also said he has dizziness in his head; this strikes him sometimes and causes him to fall. He just blacks out; he is taking medicine for these spells. Claimant stated that this has been going on for about six years but is gradually getting worse. He also said he has pains in his heart; he took nitroglycerin for a while. He also takes high blood medicine and nerve medicine.

"The claimant's earnings record shows coverage during the third quarter of 1954, all quarters in 1953, 1952 and 1951, the last two quarters of 1950, the first two quarters of 1949 and four quarters in 1948. Thus, the claimant last met the earnings requirements of the Act on March 31, 1958. It is necessary for the evidence to establish that the claimant was disabled within the meaning of the Social Security Act no later than March 31, 1958."

We find therefore a 51 year old male with a fifth grade education whose health has been diagnosed, treated or opined about by Doctors Carroll W. Bowie, J. W. Ratliff, J. W. Martin, H. H. Harris, M. P. Young, James G. Halford, Jr., Thomas Stanfield, Iverson O. Brownell, Thomas R. Carnes, and probably others not appearing in the record. In fact, in the hearing, Examiner told claimant, "You've got a batch of examinations by doctors that are not in this file. I suggest you make arrangements to get them in." In 1959 Dr. Young diagnosed him as having an enlarged heart, blood pressure 160/95, cardiovascular disease, psychoneurosis, left inguinal hernia, prognosis fair only, and "Psychoneurotic condition so advanced that he can do no work." There is no evidence but that these conditions were in existence and intensity prior to March 31, 1958.

On August 13, 1956 Dr. Harris reported to the Department of Public Welfare that claimant's heart was enlarged, blood pressure 190/90, evidence of arteriosclerosis.

In January of 1958 Dr. M. P. Young reported blood pressure 160/100, diagnoses of hypertension, retinitis and psychoneurosis with poor prognosis. In September of 1958 Dr. Young reported to the Department of Public Welfare: "the claimant shown to be partially permanently disabled" * * * "easily excited" * * * unable to keep any job on account of his nerves."

In addition to his other trouble, claimant cannot see. Included in the record before the Court is his form SS–5 application made in 1937 for an account number under the U. S. Social Security Act. The Hearing Examiner's report says "He stated he could not see well enough to tell if the signature on the Form SS–5 was his or not." On March 7, 1961 Dr. Thomas T. Stanfield (who had seen him before) reported the best corrected vision in his right eye was form perception and the left eye less than 20/200.

In the oral argument before the Court, the Government raised the question that the plaintiff did not meet the requirements for *"statutory blindness"*, under the provisions of the Social Security Act; argued that he could not be considered to be disabled due to blindness.

The Social Security Act, in defining disability, indicates that so-called "statutory blindness" shall be considered disabling without regard for the plaintiff's ability to engage in any gainful, sub-

stantial employment. 20 C.F.R. provides as follows:

§ 404.1501(b) (2)

"Blindness, without regard to ability to engage in any substantial gainful activity. 'Blindness,' for the purposes of this subparagraph, means central visual acuity of 5/200 or less in the better eye with the use of a correcting lens. An eye in which the visual field is reduced to five degrees or less concentric contraction shall be considered for the purposes of this subparagraph as having a central visual acuity of 5/200 or less. The condition described in this subparagraph is referred to as 'statutory blindness.' "

However, the same section of the Secretary's Regulations provides that disability means one of two things, either statutory blindness or inability to engage in any substantial, gainful activity because of a medically determinably impairment.

§ 404.1501(b) (1)

"Inability to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to continue for a long and indefinite period of time, or to result in death."

■■■ In other words, a person can be disabled either by statutory blindness or by other medically provable impairments. It is conceded in this case that the plaintiff does not fall within the requirements of statutory blindness, however, it is obvious that the blindness which the plaintiff does have and which is medically substantiated is sufficient to constitute a disability as defined in (1) above. The Act does not provide that all blindness must be statutory nor that the plaintiff be automatically considered able instead of disabled. There exists, in this case, a combination of impairments which, when taken together, constitutes a total disability within the meaning of the Act, even though each individual impairment may not in and of itself be of sufficient severity as to be disabling.

The plaintiff's medical records show that he has a corrected hernia, a psychoneurosis hypertension, blindness in the left eye, and poor visibility in the right eye, left kidney removed, and the psychiatrist's report shows him to be an inadequate personality. All of these impairments substantiated by the medical testimony, certainly lead one to believe that the substantial evidence, rather than supporting the hearing examiner's decision, supports the plaintiff's contention that he is disabled within the meaning of the Act, so as to be unable to engage in any gainful, substantial employment.

■ It is apparent that the Congress of the United States would never have placed on the statute books laws providing for disability benefits if it had not been the intention of that legislative body that a person who is entitled should receive. Recognizing that the burden of proof is on the plaintiff, nevertheless, welfare laws, such as the Social Security Act, intend and purpose *inclusion rather than exclusion*. As was said in Dean v. Flemming, 180 F.Supp. 553, 556 (D.C. E.D.Ky.1959). "In the case of Helvering v. Davis, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319, the Supreme Court aptly stated the purpose which Congress had in mind and the object sought to be accomplished by social security legislation. Where the question is a close one the doubt should be liberally construed in favor of the claimant. Carroll v. Social Security Board, 7 Cir., 128 F.2d 876." Klimaszewski v. Flemming, 176 F.Supp. 927, 932, (D.C.E.D.Pa.1959) is authority for the proposition that: "The word 'any' must be read in the light of what is reasonably possible, not of what is conceivable. The statute must be given a reasonable interpretation. It is a remedial statute and must be construed liberally. It was not the intention of Congress to impose a test so severe as that required by the Secretary and to exact as a condition precedent to the maintenance of a claim the elimination of every possibility of gainful employment."

The plaintiff does not have to be bedridden to come within the purview of the statute. As stated by Chief Judge Sobeloff in Thomas v. Celebrezze, 331 F.2d 541, 546 (4th Cir. 1964). "Certainly it is not necessary that * * * claimant, be bedridden to come within the statute's provisions. Neither is (Claimant) * * * required to sell (peaches) * * nor by the use of a catalogue of the nation's industrial occupations * * * go down the list and verbally negative (his) * * * capacity for each of them or their availability to (him) * * * as an actual opportunity for employment.' * * * Where the statute refers to 'any substantial gainful activity' the word 'any' must be read in light of what is reasonable and not of what is merely conceivable." (Citations omitted)

"The claimant is not required to meet every remote possibility which may be conjured up by an active imagination. The availability of the jobs (on the Secretary's list) * * * is at best speculative. * * * (T)he emphasis recently expressed * * * by Judge Butzner in McDaniel v. Celebrezze, 331 F.2d 426 (4th Cir. 1964) * * * (bears repeating) that 'reviewing courts must carefully evaluate this type of evidence in determining whether there is substantial evidence in the record taken as a whole to support the decision of the Secretary'."

This Court has applied the test set forth in Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962), reaffirmed in Jenkins v. Celebrezze,[1] 335 F.2d 6, (4th Cir. 1964), and the elements of proof are present and convincing. This Court concludes that requirement of, necessity of, and direction for various medical tests and examinations has definite probative value.

This Court finds that the Hearing Examiner's conclusions are not supported by substantial evidence, but are contrary to and in conflict with the substantial evidence as revealed in the record, Hence, it is

Ordered and adjudged, that the decision of the Secretary be, and the same is hereby reversed; and it is further

Ordered and adjudged, that the claimant, Buford H. Ferguson, be adjudged entitled to benefits under and by virtue of the applicable provisions of the Social Security Act, as amended, together with payment of benefits for such retroactive periods as are by statute allowed.

---

[1] Decided July 21, 1964, in which the Court affirmed the District Court (Hon. C. C. Wyche, Dist. Judge) in reversing the decision of the Secretary.