**Dorothy M. HEINITZ, Plaintiff,**

**v.**

**Joseph A. CALIFANO, Jr., Secretary of
Health, Education and Welfare,
Defendant.**

**Civ. A. No. 75CV544-W-4.**

United States District Court,
W. D. Missouri, W. D.

March 8, 1977.

Roger W. Calton, Raytown, Mo., for plaintiff.

Albert D. Hoppe, Asst. U. S. Atty., Kansas City, Mo., for defendant.

ORDER REMANDING ACTION TO THE SECRETARY OF HEALTH, EDUCATION, AND WELFARE FOR THE TAKING OF ADDITIONAL EVIDENCE AND THE MAKING OF ADDITIONAL NECESSARY FINDINGS OF FACT

ELMO B. HUNTER, District Judge.

This is a petition for review, under the provisions of § 405(g), Title 42, United States Code, of a decision of the defendant Secretary of Health, Education, and Welfare denying disability benefits to the plaintiff. The function of this court is to review the record of the administrative proceedings, chiefly to determine whether the decision of the Secretary that plaintiff suffers no disability within the meaning of the Social Security Act[1] is supported by substantial evidence.[2]

The transcript of the administrative proceedings which has been submitted by the Secretary shows the following: Plaintiff filed her application for disability benefits on October 23, 1973, alleging that she had become unable to work on March 3, 1972, at the age of 48 years, because of "eye trouble." Her application was denied by the Social Security Administration on initial

1. "Disability" is defined in the Act, as pertinent to this action, as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Section 423(d)(1)(A), Title 42, United States Code.

2. "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Section 405(g), Title 42, United States Code.

consideration and again on reconsideration.[3] She then requested a hearing on and determination of her claim by an administrative law judge. The following evidence was presented to the administrative law judge after that request was granted:

(1) In the hearing conducted by the administrative law judge on February 24, 1975, plaintiff appeared personally and without counsel and testified that in November 1963, her employer, Bendix Corporation, "put [her] on medical leave because [she] was allergic to teflon fumes" (Tr. 28);[4] that she has a "high school" education (Tr. 36); that, in her employment with Bendix Corporation, she performed the "welding of microparts" (*Id.*); that she has had no training in typing or shorthand since high school (Tr. 37); that she worked as a waitress while she was in high school (*Id.*), was an inspector at Lake City Arsenal from September 1951 to October 1952 (Tr. 38), was a grocery checker for Safeway from October 1953 to October 1956, was a "coil winder" and "solder operator" for Communication Accessories Corporation from October 1956 to December 30, 1957 (Tr. 39–41), and, for the Bendix Corporation, until March 3, 1972, worked in the capacity of a welder of microscopic parts and solderer (Tr. 39–43); that she terminated this employment to "see if staying away from the job and away from the close work [would cause] my eyes [to] improve" (Tr. 44); that "I can read something for a very short time [because] [m]y glasses do correct the words where it makes it clear where I can see it [b]ut after I've had them for a few minutes, my eyes start getting sore, I get a headache and I get sick to my stomach" (Tr. 44); that "[m]y eyes have bothered me ever since I got into the teflon in 1963" (Tr. 45); that

much of the work which she was required to do throughout her employment with Bendix Corporation was "close work" requiring that she wear her glasses (Tr. 49); that, in her last three years of employment with Bendix, however, she worked in the machine shop, which still required some microscopic work (Tr. 50); that from March 13, 1973, to August 31, 1973, she worked as the "administrator" of her husband's rest home in Paola, Kansas (Tr. 55); that, in that capacity, she "had to disperse the medicine, keep the medical charts, file the monthly reports on all the patients and see that they had their haircuts, that their nails were trimmed, that the house was kept clean" (*Id.*); that this would cause her eyes to "get sore" and "I'd get the violent headaches, sick in my stomach" (Tr. 55); and that "now I don't even read."

(2) Larry Cramer of the Social Security Administration in Kansas City contacted Frederick Wade, M.D., and filed a written report under the date of November 28, 1973, stating that "Dr. Wade said this claimant has 20/20 w/o glasses and 14/14 with her glasses"; that "sometimes we find individuals such as this that exhibit this condition, and there is no real explanation for it"; and that "Mrs. Heinitz has 5 pair of glasses at present and that she seems to keep buying glasses from optometrists." (Tr. 86.)

(3) A Social Security interviewer who accepted and reviewed plaintiff's "medical history and disability report" on March 25, 1974, noted that "she did not have any difficulty reviewing or signing the application or finding her way through the office." (Tr. 95.)

(4) A "disability determination and transmittal," dated January 22, 1974, and signed

**3.** The initial determination of disability *vel non* on the application for benefits is ordinarily made by the state vocational rehabilitation agency, see Section 421(a), Title 42, United States Code, or by the Secretary "in accordance with regulations prescribed by him," see Section 421(g) of the same title, and it may then be reviewed and reconsidered by the Secretary. See Section 421(c) of the same title. Thereafter:

"Any individual dissatisfied with any determination . . . shall be entitled to a hearing thereon by the Secretary . . . and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title."

Section 421(d), Title 42, United States Code. See also Section 405(b) of the same title.

**4.** The sick leave was temporary; plaintiff does not contend that she became unable to work until March 3, 1972.

by D. F. Cobrun, M.D., purports to contain a rationale for the denial of disability benefits to plaintiff. It states that its "medical sources" are "Frederick E. Wade, M.D., Board Certified Ophthalmologist, C/E report of 11/28/73" and "Richard M. Childs, M.D., Board Certified Psychiatrist, C/E report of 1/9/74." This "determination" states as follows:

> "This W/E shows no evidence of any severe psychiatric disorder. She is totally competent and should do well in work activity that does not require close work with her eyes, such as Feeder Multi-Purpose Machine (typewriter); Photographic-Machine Operator (clerical); or Collator Operator (clerical).

> "Consequently, this claim is denied and referral is made to Vocational Rehabilitation." (Tr. 98.)

The diagnosis assigned by Dr. Coburn to plaintiff's condition is "psychophysiological eye disorder." (Tr. 97.)

(5) As a basis for the denial of plaintiff's request for reconsideration, Dr. Coburn relies upon the report of Larry L. Calkins, M.D. of April 5, 1974. As he analyzes it, "[t]he medical evidence presented by Dr. Calkins substantiates no serious eye impairments." Again, plaintiff is diagnosed as having a "psychophysiological eye disorder." (Tr. 99.)

(6) A report of William Q. Wu, M.D., dated April 12, 1974, reveals that plaintiff was under his care on April 11, 1961, when she "was hospitalized because of brain hemorrhages and headaches" for which she received conservative treatment and was "dismissed, after she had improved"; that he "last saw Mrs. Heinitz on February 8, 1974," when she "said that she had been having some problems with her eyes and that she had had some violent headaches [and] gets sick to her stomach whenever she looks at something close"; that the "neurological examination was essentially negative [and] [h]er B/P when she was at the office was markedly elevated 220/120"; and that "[a]s to this patient's disability as far as her eyes are concerned as well as her headaches are related to her hypertension . . . [a]lthough her headaches may also be a residual of her previous brain hemorrhage which was over ten years ago." (Tr. 100.)

(7) Walter P. Jacob, M.D., rendered a written report dated April 15, 1974, in which he documented plaintiff's repeated headaches, hypertension, complaints of pain emanating from spinal arthritis, nausea, depression, menstrual difficulties, and injuries from an automobile accident in 1971.[5] Dr. Jacob concluded that:

> "I cannot give you any findings regarding her eyes and visual acuities since I am not an eye man, but an internist and neurological exam were all within normal limits [in February 1973].

> "Diagnosis at the last visit (in February 1973) was hypertension. As I mentioned before I cannot say anything about her eyes and visual acuities. These findings will have to be determined by an ophthalmologist, but this woman has moderate to severe hypertension which might give her problems at times." (Tr. 103.)

(8) Tests run by Stephen B. Lyons, M.D., on December 17, 1971, indicated "normal sinus rhythm. Old anterolateral myocardial infarction or septal hypertrophy." (Tr. 106.)[6]

(9) The report of Larry L. Collins, M.D., dated October 30, 1973, was to the effect that he had once examined the plaintiff on October 9, 1972; that she then was diagnosed by him as suffering from "presbyopia" which is correctible to "20/20" vision. It was Dr. Collins' opinion that no work restrictions should result from this kind of

---

5. The evidence in the administrative record which concerns this automobile accident does not indicate that plaintiff still has residual injuries which were solely caused by the accident. Reportedly, she suffered "several contusions and lacerations and a large hematoma on the left thigh," (Tr. 108) and was "hospitalized only two days and dismissed" (Tr. 109). A "review of systems" then undertaken yielded "negative" results "except for this present complaint." (Tr. 108.)

6. Dr. Lyons' electrocardiogram was taken while plaintiff was hospitalized following her 1971 automobile accident. See note 5, supra.

visual impairment. ("Presbyopia" is defined as "a condition of defective elasticity of the crystalline lens of the eye usu., in old age resulting in difficulty of accommodation and inability to attain a sharp focus for near vision." *Webster's Third New International Dictionary*, p. 1792 (1966).)

(10) W. Bass, M.D., made substantially the same report under the date of November 15, 1973, stating that he had examined plaintiff on March 5, 1971, and had found her to have "presbyopia," a condition which should not impose any restriction on her work. (Tr. 114.)

(11) Frederick E. Wade, M.D., on November 29, 1973, issued a "medical report" on plaintiff's possible "visual disability." (Tr. 115.) He found plaintiff's vision to be sufficient in all respects and without pathology. His prognosis was that her eyes "should remain the same except for advancing presbyopia." He concluded that:

"This woman has been seen by two ophthalmologists in the past 2–3 years. Her glasses are adequate. I do not find any anatomical reason for her complaint. She seems to think that her eye troubles originated in 1972 when she was working at Bendix, at which time she got irritation substance in her eye. I believe that there is a functional factor in this case— she has many social and emotional troubles." (Tr. 116.)

(12) Richard M. Childs, M.D., rendered a medical report dated January 14, 1974, in which he stated that he examined plaintiff psychiatrically on January 9, 1974, "at the request of the Missouri Vocational Rehabilitation as an aid in social security disability determination." From his interview with plaintiff, Dr. Childs concluded that "she had no complaints which she regarded as psychiatric and focused entirely on her eye problem as described . . . She said she

was otherwise not a nervous person, does not worry a great deal, is not depressed and has no trouble sleeping. She seemed comfortable and was able to laugh and smile appropriately. There was no evidence of hallucinations, delusions or defective reality testing. Her sensorium and memory were intact." Dr. Childs concluded that:

"The psychiatric examination does not reveal evidence of severe psychiatric disorder. Apparently she has reacted to eye strain or whatever eye problem is present with increased feelings of nervousness and tension. A diagnosis of a psychophysiological eye disorder could well be appropriate, but it would be difficult to say that she is currently totally disabled due to a psychiatric illness." (Tr. 120.)

(13) The report of Larry L. Calkins, M.D., dated April 5, 1974, was to the following effect:

"Mrs. Heinitz did visit my office on March 1, 1974, but I did not examine her. She had been to several competent ophthalmologists since I had previously seen her on October 9, 1972. They confirmed my findings of 1972 at which time I could find absolutely nothing wrong with her eyes. (See report from Dr. Fred Wade.) She had usual presbyopia for a person 50 yrs. of age and her vision was 20/20 and Jaeger # 1 with proper glasses. I was not able to find any evidence of ocular damage from her alleged exposure to Teflon fumes while employed at Bendix Corp. in 1962."

(14) Medical records of the Bendix Aviation Corporation, Kansas City Division, dating from February 6, 1958, to December 8, 1971, were also submitted to the administrative law judge. (Tr. 122–162.) These records also show the frequent nausea, menstrual troubles, dizziness, and headaches which her treating physicians record.[7] One episode of

---

7. It is not ascertainable from the administrative record whether the entries in the Bendix records constitute medical evidence within the meaning of the Social Security Act. There is no record concerning whether the entries in these records were made by physicians or whether the conclusions in them are reflective of "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." See Section 423(d)(3), Title 42, United States Code. If they are, however, they depict a long period of continued pain, dizziness, vomiting, nervousness, depression occurring with some frequency since the year 1958. Further, they tend to support her

reported headaches over a two week period was reported by her on January 22, 1963, apparently related to her "working on hot wire stripping." (Tr. 131.) Similar complaints were recorded throughout the year 1964. (Tr. 132–133.) And, throughout the records, there are indications of recurring nervousness and physiological symptoms thought to be related to her family problems.[8]

On the basis of the foregoing evidence, the administrative law judge issued his decision on February 28, 1975, denying disability benefits to plaintiff. (Tr. 11.) In evaluating the evidence, the administrative law judge reasoned as follows:

"The reports from the internist, Dr. Jacob, do not indicate any disabling problem. There is some hypertension and he states that it is moderate to severe, which might give her problems at times.

"The medical reports establish that the claimant's visual acuity is normal . .

"On the basis of the medical evidence in the file, the claimant has failed to establish any eye problem. The doctors do not find anything wrong. She does state that her eye condition is fine for 10 or 15 minutes and that after that she is unable to use her eyes for any close work. "Mrs. Heinitz was examined by Dr. Childs, a psychiatrist. Dr. Childs states that there is no severe psychiatric disorder. He reports that apparently she is reacting to eye strain, or whatever eye problem is present, with increased feelings of nervousness and tension and a diagnosis of a psychophysiological eye disorder could well be appropriate, but it would be difficult to say that she is currently totally disabled due to psychiatric illness.

"Even assuming that Mrs. Heinitz does have limited use of her eyes, it would seem that even with this condition, she should be able to do work not requiring fine eyesight such as a waitress or counter employee at a hamburger stand. Although she may not make as much as she did at Bendix, the test for disability for Social Security purposes is not whether the claimant has to take a job paying less,

complaints that, after 1963, her work caused her to have headaches and "swelling of skin around the eyes." (Tr. 132.)

8. See, e. g., the following entries in the Bendix records:

"3–4–58 1:42p    Med; Feels like crying—shaky—can't hold solder iron, nervous over home problems, also menstrual troubles, phensal II, advised." (Tr. 123.)

"6–11–59 1:30p   . . . cramping . . . Pain and tenderness increasing since this a. m. Father died two weeks ago." (Tr. 128.)

"6–20–61 . . . .  . . . "nervous exhaustion . . ." "Treated by Dr H Passman MD T 98 Is on novalden 3 x daily for brain hemorrhage." (Tr. 129.)

"1–22–63 12:35p Med: Headache for past two weeks. Onset when she started working on hot wire stripping. She asked her foreman to permit her to go to 'tinning' table, but he said she would have to go to medical. Past Hist: In April, 1961, she had an attack of loss of consciousness at home and was said to have had convulsions while unconscious. She was hospitalized and was told she had brain hemorrhages. About a week after leaving hospital and while convalescing at home, she had a second episode of unconsciousness and was returned to the hospital. Dr. Passman was her doctor. Also seen by Dr. Wu, neurosurgeon. History of migrain headaches since 1955. Diagnosis by Dr. Possman—subarachnoid hemorrhage. Present Illness: States she has been on novaldin and milltown; has taken as many as 3 or 4 tablets of milltown per day. States if she gets tense she may get a headache and then becomes worried that she may have another loss of consciousness. These symptoms are not related to her present work as hot wire stripper. However, this work may be another cause for tension, and subsequent headaches . . . ."

These are but a few of the entries of the type in her medical records with the Bendix Corporation.

but whether she can engage in any substantial gainful activity. There should be many other types of activity within the economy, such as working as a cashier in a garage where she would operate a cash register and make change for parking patrons. There are other types of work not requiring fine eyesight. It would seem reasonable to believe that she should be able to take the burrs off those metal parts which she was doing at Bendix. This type of work does not require fine eyesight and a sense of feel should determine whether the burr has been removed satisfactorialy." (Tr. 15–16.)

On June 12, 1975, the Appeals Council of the Social Security Administration affirmed the decision of the administrative law judge without further opinion. "Accordingly, the hearing decision stands as the final decision of the Secretary."[9]

*Judicial Review of the Secretary's Decision*

■ The scope of review of the Secretary's decision by the federal district court is, as noted above, governed by the provisions of § 405(g), Title 42, United States Code. That section pertinently provides as follows:

"The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . The court . . . may, at any time, on good cause shown, order additional evidence to be taken before the Secretary, and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or its decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."

In this action, the medical evidence which was presented to the administrative law judge is sparse, ambiguous, and insufficient to resolve the material factual issues.[10] It cannot be concluded from the administrative record that there is either substantial evidence to support the decision of the Secretary or a preponderance of evidence[11] to sustain the claims of plaintiff that her symptoms and complaints, viewed in terms of their cumulative effect on her ability to perform,[12] warrant a finding that she is, or has been, unable to engage in substantial gainful activity for a period of 12 months or more.[13] Nor does plaintiff make a showing

---

9. Tr. 3.

10. While the evidence may be conclusive, or nearly so, that plaintiff does not currently have an organic defect of her eyes, it does not sufficiently develop plaintiff's functional complaints to determine whether they alone or in combination with her other complaints may be of such severity as to constitute medically determinable impairments which prevent her from engaging in substantial gainful activity.

11. A social security disability claimant cannot lawfully be required to prove his or her claim by more than a preponderance of the evidence. See *Pollard v. Gardner*, 267 F.Supp. 890, 893 (W.D.Mo.1967).

12. As is readily apparent from the opinion of the administrative law judge, quoted above on pages 11 and 12, the multiple impairments professed by plaintiff were considered separately by him, with chief focus on what he terms the "eye problem." But the governing law is to the

effect that, in determining the severity of a claimant's inability, "the Secretary (is to) view the individual as a whole. It is senseless to view several disabilities as isolated from one another . . . Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being." *Landess v. Weinberger*, 490 F.2d. 1187, 1190 (8th Cir. 1974). See also *Haskins v. Finch*, 307 F.Supp. 1272 (W.D.Mo.1969).

13. To show disability by reason of blindness alone, the requirements of Section 423(d)(1)(B), Title 42, United States Code, and of Section 416(i)(1) of the same title. The former section provides that the term "disability" means:

"in the case of an individual who has attained the age of 55 and is blind (within the meaning of 'blindness' as defined in section

that she is afflicted by the organic, statutorily-defined blindness which would, without more, compel a finding of a compensable total and permanent disability.[14]

■ On the other hand, however, such evidence as has been submitted—including plaintiff's testimony respecting the deleterious effect on her eyesight of the "close" and "microscopic"[15] work in which she is experienced and the reports of physicians respecting her constant nervous condition and her repeated exhibition of nervous systems, including stomach pains and vomiting—if properly developed and viewed in combination may constitute a functional nonpsychotic disorder, one of the impairments listed by the Secretary in Subpart P, Title 20, Code of Federal Regulations, as a disability which is *per se* compensable under

the Social Security Act[16] if the following symptoms are affirmatively shown:

"12.04 *Functional nonpsychotic disorders (psychophysiologic psychoneurotic and personality disorders).* Manifested by marked restriction of daily activities and constriction of interests and deterioration in personal habits and seriously impaired ability to relate to other people and persistence of one of the following:

\*  \*  \*  \*  \*  \*

"F. Persistent functional disturbance of *vision*, speech, hearing or use of a limb with demonstrable structural or trophic changes; . . ." (Emphasis added.)

Plaintiff may be able to show by proper and acceptable evidence the date of onset and continuance of any "marked restriction of daily activities" together with a "constric-

---

416(i)(1) of this title), inability by reason of such blindness to engage in substantial gainful activity requiring skills or abilities comparable to those of any gainful activity in which he has previously engaged with some regularity and over a substantial period of time." The latter section defines "blindness" as "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens." The evidence which is currently in the administrative record clearly shows that plaintiff does not meet these requirements. However, the "Act does not provide that all blindness must be statutory nor that the plaintiff (who cannot prove statutory blindness) be automatically considered able instead of disabled. There (may exist) a combination of impairments which, when taken together, constitutes a total disability within the meaning of the Act, even though each individual impairment may not in and of itself be of sufficient severity as to be disabling." *Ferguson v. Celebrezze*, 232 F.Supp. 952, 956 (W.D.S.C.1964); *Dunn v. Richardson*, 325 F.Supp. 337, 346 (W.D.Mo. 1971).

14. See note 13, *supra*.

15. In view of claimant's uncontradicted testimony that, throughout her employment at Bendix, much of her work continued to consist of "close" work, it is doubtful whether the administrative law judge's finding that "she should be able to take the burrs off those metal parts which she was doing at Bendix" (see page 11 of the text of this memorandum) is supported by substantial evidence. The "burr" work was also described by her as partly "done under the microscope" (Tr. 50) and as immediately preceding her determination (supported, she

claims, by a physician's opinion) to "see if staying away from the job and away from the close work my eyes wouldn't improve." (Tr. 44.) Plaintiff's testimony in the administrative proceedings "by itself is not enough; there must be medical corroboration of her disability . . . Claimant should be entitled (therefore) to have the views of her treating physicians more fully developed." *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974). After the remand of this action, therefore, the Secretary should grant the plaintiff a fair opportunity to present the report of the physician who purportedly concurred in her election not to return to work because of her medical condition.

16. In fact, in order to obtain disability benefits, it would not be necessary to show a degree of severity equal to or greater than that described in the listings. In Section 404.1506(a), Title 20, Code of Federal Regulations, it is noted that the impairments which are listed by the Secretary are deemed to be "of a level of severity deemed sufficient to preclude an individual from engaging in *any gainful activity*." (Emphasis added.) In order to be entitled to disability benefits, however (as opposed to widow's benefits and other types of social security benefits), a claimant need only meet the lesser standard of showing that he or she is unable to engage in any *substantial* gainful activity. See *Hollis v. Mathews*, 520 F.2d 338, 340 (5th Cir. 1975). Therefore, if plaintiff can show that she meets the requirements of the listing, she must automatically thereby show that she meets the requirements of Section 423(d)(1), Title 42, United States Code, relating to ordinary disability.

tion of interests . . . deterioration in personal habits and seriously impaired ability to relate to other people." She may also be able to show that she contemporaneously suffered "[p]ersistent functional disturbance of vision." If so, she would be entitled to a period of disability under the Secretary's own regulation, § 404, 1506(a), Title 20, Code of Federal Regulations, which provides:

"The Listing of Impairments describes, for each of the major body systems, impairments which—(1) Are of a level of severity deemed sufficient to preclude an individual from engaging in any gainful activity; and (2) Are expected to result in death or to last for a continuous period of not less than 12 months."

Further, it is to be noted that "hysterical blindness" [17] is considered to be a disability within the meaning of the Social Security Act. *Dunn v. Richardson*, 325 F.Supp. 337, 344 (W.D.Mo.1971). And neither the administrative law judge nor any of the physicians who rendered reports in the administrative action reviewed plaintiff's condition to determine whether she meets the standards of the above listing. Even Dr. Childs' report purports only to review her psychiatric condition as separate and apart from her eye disorder.[18] But the evidence in that report and in other reports indicates that plaintiff's condition may, if properly viewed, meet the requirements of the listing.[19]

Other evidence which is in the administrative record suggests that, if the medical findings of plaintiff's treating and examining physicians are fully divulged or, alternatively, if she is properly examined and assessed in terms of her "total physiological well-being," *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974), she may be able to show that her hypertension is of great severity; that she suffers from myocardial infarction; and that all her ailments in combination prevent her from engaging in any substantial gainful activity. As noted above, electrocardiograms taken in 1971 indicate a history of myocardial infarction. And the sparse evidence presented on the subject indicates that plaintiff may suffer a chronically elevated blood pressure, relatively recently recorded at 220/120 in February 1974. This is a degree of elevation which the Secretary's regulations regard as sufficient to establish a period of disability if it recurs consistently and if it is accompanied by certain other symptoms which have hitherto not apparently been given sufficient attention. See paras. 4.00, 4.03, and 4.20 of Subpart P, Appendix, Title 20, Code of Federal Regulations, and

Therefore, while the evidence which is currently in the administrative record does not warrant a finding that plaintiff is unable, by reason of a medically determinable impairment or impairments, to return to her former type of work (and has been so unable for a period of 12 months or more),[20] it indicates that there *may* be such a disability and, further, that the additional evidence necessary to demonstrate it may be "readily obtainable," within the meaning of *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3d Cir. 1974). See also and compare, *Heisner v. Secretary of Health, Education and Welfare*, 538 F.2d 1329, 1332 (8th Cir. 1976). Therefore, this action should be remanded to the Secretary

---

**17.** See Schmidt's Attorneys' Dictionary of Medicine, Vol. I, p. 442, to the following effect:

"*hysteria* * * *. A type of mental condition, technically a psychoneurosis, in which exaggerated emotions become transformed into physical manifestations . . . . Hysteria may mimic almost any disease, especially *blindness*, paralysis, etc., and often simulates a state of hypnosis. It affects women, especially young women, more often than men. The cause or causes are not fully understood . . . ." (Emphasis added.)

**18.** Dr. Childs appears to have viewed plaintiff's psychiatric problems as a reaction to her eye strain. It does not appear that the possibility that her emotional problems may have led to her "eye problem" was considered.

**19.** The administrative record is replete with allusions to the possible existence of proper medical evidence of a longstanding nervous disorder which antedated plaintiff's complaints respecting her eyes. See notes 7, 8, and 18, *supra*.

**20.** See note 1, *supra*.

of Health, Education, and Welfare for the purpose of granting the plaintiff an opportunity to make the necessary showing. This is so even though the plaintiff initially bore the burden of proof to sustain her claim of disability and failed to do so. For, as noted above, the medical evidence which she did in fact produce shows that the necessary proof may well exist and that, in fact, it may come from the same physicians who have rendered the abbreviated medical reports which are currently in the administrative record.[21] Plaintiff should not be penalized by the summary denial of her claim for failure of her physicians to memorialize the clinical and laboratory findings which are necessary to demonstrate a claim of disability.[22] Further, the administrative law judge himself is under a duty to elicit and gather such evidence, if it exists, as will enable him to resolve the material factual issues.[23] *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974). See also *Pollard v. Gardner*, 267 F.Supp. 890, 903 (W.D.Mo. 1967) ("[E]vidence [must be taken] on the material factual issues.") And finally, when the exacting requirements of a listing under Subpart P, Title 20, Code of Federal Regulations, are involved, requiring specific and multiple showings in order to establish disability, a claimant should be given an opportunity to make those showing after being explicitly advised of the requirements of the Secretary's regulation.[24]

Even if, however, the plaintiff fails, after remand, to meet those strict requirements, the Secretary still must consider—viewing the additional evidence taken, together with the existing evidence which is already in the administrative record—whether plaintiff's particular combination of impairments may not, nevertheless, be of such severity that they preclude plaintiff from returning to her former type of work. See, e. g., *Dunn v. Richardson*, 325 F.Supp. 337, 346 (W.D.Mo.1971).[25] If so, the Secretary must then adduce evidence of work which exists in the national economy and which is suitable for plaintiff, given her age, education, background, and particular level of impairment. *Meneses v. Secretary of Health, Education and Welfare*, 143 U.S.App.D.C. 81, 442 F.2d 803, 807 (1971); *Johnson v. Richardson*, 486 F.2d 1023 (8th Cir. 1973); *Timmerman v. Weinberger*, 510 F.2d 439, 443 (8th Cir. 1975); *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975). On the issues of (1) whether there are particular jobs "realistically within the physical and mental capabilities of the claimant," *Timmerman v. Weinberger*, supra, at 442, and (2) whether those jobs exist "in significant numbers either in the region where such individual lives or in several regions of the country," § 423(d)(2)(A), Title 42, United States Code, "particularized proof" must be adduced by the Secretary. *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th Cir. 1975). Without such "particularized proof" in the record, it was improper for the administrative law judge in this action to find that plaintiff is "able to do work not requiring fine eyesight such as a waitress or a counter employee at a hamburger stand."

Finally, it is implicit in the foregoing considerations that, after remand and after the taking of additional evidence, the administrative law judge must make a specific finding to resolve the issue of whether plaintiff's condition would permit her to

---

**21.** See notes 7, 8, 15, 18, and 19, *supra*.

**22.** This is particularly so when she was not represented by counsel in the administrative proceedings. See *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974).

**23.** "Here the evidence *gathered* by the examiner from her physicians does not in any way develop the extent of her disability." *Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974).

**24.** "Under these circumstances, when plaintiff, uncounseled, faced a burden of producing evidence of a technical nature to meet exacting burdens of proof and succeeded in showing that, if granted a fair opportunity, she may well make the required showing, 'good cause' is shown for remand of this action to the Secretary for the taking of additional evidence." *Akins v. Califano*, Civil Action No. 74CV549-W-3 (W.D.Mo. Feb. 11, 1977).

**25.** See note 13, *supra*.

return to her former type of work. His finding in that respect in the decision under review is not sufficiently specific.[26]

It is therefore, for the foregoing reasons

ORDERED that this action be, and it is hereby, remanded to the Secretary of Health, Education, and Welfare for the taking of additional evidence and the making of additional findings in accordance with the above and foregoing considerations.