**Hoy RAY, Plaintiff,**

v.

**SECRETARY OF HEALTH, EDUCATION AND WELFARE, Defendant.**

**Civ. A. No. 7–72814.**

United States District Court,
E. D. Michigan, S. D.

Nov. 9, 1978.

Bruce L. Jerris, Levine & Benjamin, P.C., Detroit, Mich., for plaintiff.

James K. Robinson, U. S. Atty., by Pamela J. Thompson, Asst. U. S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION

FEIKENS, District Judge.

This is an action for judicial review of a final decision of the defendant Secretary of Health, Education and Welfare denying plaintiff's application for disability benefits for the period November 15, 1973 to June 1, 1976.  42 U.S.C. §§ 416(i) and 423.

## ISSUE

The sole issue involved here is whether the defendant's decision is supported by substantial evidence. 42 U.S.C. § 405(g). The case is before me on cross motions for summary judgment.

## FACTS

Hoy Ray is a 55 year old male who has a sixth grade education. Between 1945 and November 15 of 1973 he worked at the Hooker Chemical Co. For most of his tenure there he handled 100 pound bags of silica, inhaling toxic dust as he worked. In November of 1973 Ray was forced to retire because of silicosis and heart disease. (Tr. 160). He has not worked since.

On February 14, 1974 Ray filed an application for disability benefits. The application was denied initially (Tr. 150–1), and again upon reconsideration (Tr. 152). On January 6, 1976 a hearing was held before Administrative Law Judge Joseph Sitek. (Tr. 58–80). The medical evidence considered at the hearing confirms that Ray has silicosis. He is also afflicted with pneumoconiosis, tuberculosis which may or may not be active,[1] various pulmonary problems (including pulmonary emphysema), chronic malaria, shortness of breath and easy fatiguability.[2]

The testimony presented at the January 6 hearing established that Ray was under medical care for tiredness and that he received shots to clear up congestion in his lungs approximately every two weeks. (Tr. 65, 66–67). Ray was also on daily medication for the latter problem. (Tr. 67–8). He has had problems with numbness and lack of power in his arms since November of 1973. (Tr. 68–9).

As to his physical abilities, Ray played cards and was able to walk to the grocery store one and one-half blocks away. (Tr. 69, 70). The walks brought on coughing spells and necessitated rest. (Tr. 76).

Since 1973 Ray has been unable to do heavy lifting. (Tr. 75).

Although Ray clearly demonstrated his inability to return to this former employment (Tr. 28, 184, 206), no vocational expert was employed by the Secretary to establish the existence of substantial gainful work which exists in the national economy as 42 U.S.C. § 423(d)(2)(A) has been interpreted to require.

On May 10, 1976 the Administrative Law Judge held that the plaintiff was not disabled from all gainful employment, relying on statements by the plaintiff's personal physician which did not rule out all occupational activity. (Tr. 48). The Administrative Law Judge then took official notice of substantial numbers of sedentary jobs which the plaintiff could perform in a pollution free environment and denied benefits. *Id.*

The Appeals Council remanded the case for testimony from a vocational expert on the question of whether there were jobs that the claimant could perform existing in significant numbers in either the claimant's region or in the national economy. (Tr. 28).

## THE SECOND HEARING

The hearing on remand was held on March 10, 1977, 14 months after the first. The hearing was held *de novo* and Ray's condition was again thoroughly explored. The evidence was substantially identical to that produced at the first hearing. It showed that Ray was on no medication for sleep (Tr. 87), took Quilbin three times a day for breathing congestion and that the Quilbin worked better than the pink pills he had been taking before. (Tr. 88, 90). Ray still received shots for congestion but took no medication for fatigue. (Tr. 93, 90). He had given up playing cards (*id.*) but he could still walk one and one-half blocks to the store though he needed 10–15 minutes of rest afterwards. (Tr. 90, 94). He rested

---

1. Part of one lung was removed for tuberculosis in 1960. (Tr. 199).

2. The plaintiff has been examined by a number of doctors. Allan Schwartz (Tr. 174–79, 180); Bernard Dash (Tr. 182–5); Gracelia Rojas (Tr. 187–96); Ernest Hershey (Tr. 198–220, 210–11); John Mucasey (Tr. 202–04); Arthur Cooper (Tr. 206), and Doctors' Hospital (Tr. 208–9).

4–6 hours a day. (Tr. 92). He was unable to raise his arms and suffered from numbness in them (Tr. 95), a condition which had been constant for the previous two years. *Id.*

At the second hearing Ray testified twice that his condition was the same as at the first hearing.

ALJ: Would you say that your condition is worse now than when I last saw you? Or about the same?

Claimant: About the same, condition is. (Tr. 92–3).

ALJ: Since you left until the present time, has your condition remained the same, gotten better, gotten worse?

Claimant: It's about the same to me. I mean, I just feel tired, like I was whenever I was working. (Tr. 103).

The vocational expert, Dulecki, testified that if the plaintiff's testimony was accepted at face value there would be no jobs for him anywhere. (Tr. 109). In answer to a hypothetical question which assumed that the claimant could do no heavy lifting, no repetitive bending, could not be exposed to pollution or dust, could not raise his arms, could sit for one hour and stand for one-half hour and walk one block, Dulecki stated that "[g]iven his education, *very few*" jobs would be open to Ray. (Tr. 108, emphasis added). Most clerical jobs would be ruled out, Dulecki opined, because of Ray's lack of education. *Id.* Dulecki stated further that there were "about 3,500" small product assembly jobs in the Detroit area that plaintiff could under normal circumstances perform but that most of those would be ruled out because they occur in factory settings where pollutants are present. (Tr. 108–9). He stated: out of 3,500 "we'd probably be doing very well to find a thousand that" claimant would be able to do. (Tr. 109). However, Dulecki was only able to specifically identify 70 such jobs (Tr. 109) and stated that he had arrived at the 1,000 figure by considering places like "Midwest . . . on Groesbeck", whose assembly area is not dust free, inferring from polluted-air jobs the existence of pollution free jobs. (Tr. 110). He further stated that the 1,000 figure was "the maximum [he could] come up with" and was "kind of an educated guess." (Tr. 111). On cross examination it became clear that he thought because there were 3,500 polluted-air jobs there ought to be 1,000 "clean" ones. (Tr. 116–7). Because of the general uncertainty and vagueness in Dulecki's testimony the hearing was adjourned to allow him to collect his notes and review his data. (Tr. 122–3).

## THE THIRD HEARING

At the third hearing, on April 14, 1977, Dulecki testified that "there are not many jobs" one in plaintiff's condition could perform. (Tr. 128). He then outlined 301 that he knew from first hand knowledge existed. (Tr. 132).[3] He also stated that "we're going to be doing darned well to find 1,000 jobs this man is going to be able to do," (*id.*) and later agreed that the 1,000 figure was "simply another guess." (Tr. 137).

The Administrative Law Judge then questioned Dulecki about the existence of dust free jobs that the plaintiff could perform in the national economy. Dulecki stated that there are 1,000,000 such assembly jobs in the national economy but that he was completely unable to pin down how many of those would be dust free. He felt there "might be 50,000" nationwide (Tr. 138) but also stated he was "reluctant to even come up with . . . an amount that would . . . fit [the] hypothetical with a dust free condition." (Tr. 139).

His data provided him no information on dust free jobs *per se* (Tr. 140). When the plaintiff's lawyer asked if the 50,000 figure "is just an absolute guess" he replied, "Essentially [yes] . . . I see very few jobs that this man can do." (Tr. 142).

## CONCLUSIONS OF FACT

I conclude that there are 200 jobs in the Detroit area which Ray could perform and that there is no credible evidence that dust free jobs exist in several regions of the

---

**3.** Dulecki later revised this figure to 200 for reasons which do not appear in the record.

national economy as defined in § 423(d)(2)(A).

I also find that Ray's medical condition at the second hearing substantially the same as at the first. If there is any difference, Ray had improved in the interim. The Administrative Law Judge's attempts to distinguish his condition are, as Ray's brief explains, filled with errors and dependent upon trivialities. (Tr. 21).[4] Because jobs were no more plentiful or available at the time of the first hearing than at the second, the results of the two must be the same. Therefore, benefits should be retroactive to November 15, 1973 rather than to June 1, 1976.

## CONCLUSIONS OF LAW

■ Once a claimant has established that he is unable to perform his former job the burden of production shifts to the Secretary to show that he is able to:

> . . . engage in any other kind of substantial gainful work which exists in the national economy . . . . For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in *significant numbers* either in the region where such individual lives or in several regions of the country. 42 U.S.C. § 423(d)(2)(A) [emphasis supplied]

*Vaughn v. Finch*, 431 F.2d 997 (6th Cir. 1970); *May v. Gardner*, 362 F.2d 616 (6th Cir. 1966); *Graves v. Secretary*, 473 F.2d 807 (6th Cir. 1973); *Shavers v. Secretary*, 438 F.Supp. 535, 536 (E.D.Mich.1977).

■ The question here is whether the Secretary has provided substantial evidence that there were jobs within Ray's capabilities in *significant numbers* either in the Detroit area or in several regions of the country. It may be concluded on several grounds that he has not done so.

First, the expert, upon whose testimony the denial must rest, was throughout uncertain, contradictory and equivocal. On the one hand, he established 200 jobs which the claimant could perform yet at a number of places he stated that there were "very few" jobs that Ray could perform. He repeatedly made assertions as to how many jobs were available to Ray which, upon cross examination, proved to be founded upon guess or surmise. Moreover, after the adjournment, his testimony did not improve. Bearing a striking similarity to the instant case is *Graves v. Secretary, supra*. There the appellant had the residual capacity to perform light, sedentary work which did not involve bending or stooping. The vocational expert described several places in the Detroit area (where the claimant lived) where jobs for which she was qualified would exist. He concluded that the number of jobs for which the appellant would qualify was about "1 to 5% of the light factory work in the Detroit area" (footnote omitted). At *n.5* the court elaborated, stating:

> [the] vocational expert testified that in Detroit with a metropolitan population of about three million people, jobs for which the appellant would qualify would number between 750 and 1000. . . .

However, the expert also stated that jobs the plaintiff could do were not "out there in great numbers," *id.*, and was in several other respects equivocal and incredible.

The court held that the defendant had not met his burden under § 423(d)(2)(A). The opinion is not explicit as to whether the holding rested upon the scarcity of jobs or credibility problems with the witness. However, upon scrutiny it is apparent that the court attached substantial weight to the small size of the number of jobs available to the claimant. This indicates that 750 jobs in the Detroit area is probably not a "significant number" as that term is defined in the statute.

In this case the expert could only establish that there were 200 jobs that Ray could perform. Moreover, the *Graves* expert's

---

4. The Administrative Law Judge's efforts to distinguish the November 15, 1973 to June 1, 1976 period on the basis of a difference in Ray's demeanor at the two hearings are likewise of no avail. There is no basis for a comparison between the two nor does any evidence place the onset of disability at June 1, 1976.

testimony was equivocal in a manner similar to Dulecki's equivocation. For example, at Tr. 108, Dulecki stated there were "very few" jobs that Ray could perform. The expert in *Graves* stated, in apparent conflict with his numerical estimate, that jobs the claimant could perform would not be "out there in great numbers" and would be "in a notable minority." *Id.*, at 809. Further, I find that 200 jobs is not a significant number of suitable jobs. This number represents only a little over one ten-thousandth of the jobs in the Detroit area.

My conclusion that 200 is not a significant number of jobs as defined in the Act is based upon a study of the legislative history of the Act. The last sentence in § 423(d)(2)(A) which contains the phrase at issue, was added in 1967 as part of P.L. 90–248, the Social Security Amendments of 1967. These amendments were prompted by the rising cost of the Social Security disability insurance program which Congress felt was due in part to a body of court decisions which had focused on whether there was "a reasonably firm basis for thinking that the claimant can obtain a job within a reasonably circumscribed labor market" in deciding whether to award benefits. The Senate Report cited with disapproval courts' tendency to put the burden of proof on the government and to award benefits to claimants unable to secure employment for reasons such as an employer's unwillingness to hire persons with physical limitations. The Senate Report states:

> [a]s a remedy for the situation which has developed, the committee's [House Ways and Means Committee] bill would provide guidelines to reemphasize the predominant importance of medical factors in the disability determination.

S.Rep.No.744, 90th Cong., 1st Sess. *reprinted in* U.S.Code Cong. & Admin.News 1967, pp. 2834, 2882–2884 (Nov. 14, 1967).

■ However, it is apparent that notwithstanding the desired emphasis on medical standards of disability, Congress did not intend to exclude from eligibility those able to engage in an activity that is in theory substantial and gainful, but is as a practical matter nonexistent or nearly so. This is the reason for defining "work which exists in the national economy" as "work which exists in *significant numbers*." The Senate Report states:

> It is not intended, however, that a type of job which exists only in very limited numbers or in relatively few geographic locations would be considered as existing in the national economy. *Id.*, at 2882.

And the Conference Report states:

> The purpose of so defining the phrase is to preclude from the disability determination consideration of a type or types of jobs that exist only in a very limited number or in relatively few geographic locations in order to assure that an individual is not denied benefits on the basis of the presence in the economy of isolated jobs he could do.

Conf.R.No.1030, 90th Cong., 1st Sess., *reprinted in* U.S.Code Cong. & Admin.News 1967, pp. 3179, 3197–8.

From these pronouncements I conclude that although the 90th Congress intended to rein in decisions it believed inimical to the disability insurance system's actuarial basis, it did not disturb the concept of fairness that is immanent in the Act; that benefits should not be denied unless there is a real opportunity for the claimant to find employment.

■■ The cases bear out this conclusion. The mere theoretical ability to engage in substantial gainful employment is not a sufficient basis to deny benefits. *Timmerman v. Weinberger*, 510 F.2d 439, 442 (8th Cir. 1975); *Mitchell v. Weinberger*, 404 F.Supp. 1213, 1219 (D.Kan.1975); *Dressel v. Califano*, 558 F.2d 504, 507 (8th Cir. 1977). A claimant not be foreclosed on the basis of a few isolated jobs. *Walker v. Mathews*, 546 F.2d 814, 819 (9th Cir. 1976). The government is required to present substantial evidence in the form of particularized proof that significant numbers of jobs which the claimant can perform exist. *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th

Cir. 1975); *Heinitz v. Califano*, 428 F.Supp. 940, 950 (W.D.Mo.1977).[5]

■ On the other hand, the claimant's employability *per se*, is not the touchstone. *Miranda v. Secretary*, 514 F.2d 996, 998 (1st Cir. 1975). Moreover, that work is not available is not determinative. *Pruchniewski v. Weinberger*, 415 F.Supp. 112, 116 (D.Md.1976). Nor is it controlling that the claimant would not be hired if he applied for work. *Id.; Miranda v. Secretary, supra*, 514 F.2d at 998.[6] But is is not sufficient that the government has merely shown that there exist somewhere jobs which the claimant could perform. To adopt this approach would eviscerate the last sentence in the 1967 amendments to § 423(d)(2)(A).

I think that a reasonable interpretation of the "significant numbers" phrase requires the conclusion that jobs which comprise only about .00013 of the work force in the plaintiff's region do not exist in "significant numbers." When jobs are this scarce, they exist "only in a very limited number" as described in the Conference Report referred to earlier. I think this conclusion gives effect both to Congress' desire to curtail judicial liberality in awarding benefits, as evidenced by the way in which the amendments reduce the burden on the government, and to its desire that employment should exist in a meaningful sense before benefits are denied. I have unearthed no other case which has attempted to explore this delicate balance, nor has any case given substance to the phrase "significant numbers."

For the reasons stated herein, the decision of the Administrative Law Judge is REVERSED and benefits are awarded for the period November 15, 1973 to June 1, 1976.

---

5. Some cases have gone too far in this respect. *E. g., DeMandre v. Weinberger*, 414 F.Supp. 784, 787–8 (E.D.La.1976). (ALJ should identify a "reasonably broad range of jobs that a person with the claimant's disability could perform.")

---

6. The statute is explicit on these points. 42 U.S.C. § 423(d)(2)(A).