Jones, J.
We hold that section 234 of the Family Court Act is constitutional notwithstanding that it authorizes Family Court in New York City to direct parents of handicapped children, other than children who are blind or deaf, to contribute to the maintenance of such children in connection with their education.
*657 Appellants are parents of three handicapped children,[1] each of whom it is agreed is in need of special residential educational training and for none of whom does the City of New York have an appropriate educational facility. Each of the three children was attending a suitable private residential school. In each case Family Court granted the parents’ applications for payment of full tuition as well as of all related transportation expenses. Three orders denied that part of the applications requesting maintenance payment, the court finding the parents of two of the children financially able to pay for board and lodging in full and accordingly directing them to make such payments. The fourth order granted the application to the extent of two thirds of maintenance costs, directing the parent of the third child to pay the remaining third. Appellants all concede their ability to make the payments ordered. It is their contention that the statute under which they were directed to pay maintenance expenses is unconstitutional. Family Court rejected that contention in each case. The present direct appeals on constitutional grounds ensued (NY Const, art VI, § 3, subd b, par [2]; CPLR 5601, subd [b], par 2) and have been consolidated for our review.
Appellants’ challenge to the statute is grounded in contentions that they have been denied equal protection of the law in two aspects. First, and principally, they urge that to require them to contribute to the maintenance component of educational expenses when no such contribution is required of the parents of deaf or blind children works a constitutionally impermissible discrimination. Secondly, they argue that, while the statutes authorize the imposition of such burden on parents of handicapped children in New York City, the same is not true with respect to children who reside outside New York City, and that this circumstance likewise constitutes a denial of equal protection.
There can be no doubt that a handicapped child has a right to a free education in the State of New York. (NY Const, art XI, § 1; Education Law, § 3202, subd 1; Matter of Wiltwyck School for Boys v Hill, 11 NY2d 182.) The handicapped child is *658 further assured such free specialized educational training as may be required. (Education Law, § 4403; Family Ct Act, § 231 et seq.)
Incident to the direct cost of education, i.e., tuition, are the expenses of maintenance and transportation. It is not disputed that under our State’s educational program the parents of all handicapped children have no responsibility for either tuition or transportation expense. The controversy here revolves around the imposition on the parents of handicapped children, other than those who are blind or deaf, of the costs of maintenance.
The fulcrum of appellants’ argument is the circumstance that in consequence of legislative enactment the State provides wholly free education, including all maintenance expense, to children who are either blind or deaf, and that the parents of such handicapped children are not required to make any contribution to the cost of maintenance regardless of their financial ability. (Education Law, arts 85, 87, 88; §§ 4204 [deaf children], 4207 [blind children].) The assertion is that this differentiation, operating to the disadvantage of appellants, deprives them of equal protection of the law.
At the threshold of consideration of any equal protection claim is the determination of the applicable standard of review. Handicapped children as such do not constitute a "suspect classification” (cf. Matter of Lalli, 38 NY2d 77 [illegitimate children]; Matter of Malpica-Orsini, 36 NY2d 568 [illegitimate children]; contrast Loving v Virginia, 388 US 1 [race]; Hernandez v Texas, 347 US 475 [national origin]; Matter of Griffiths, 413 US 717 [alienage]). Nor is the right to education such a "fundamental constitutional right” as to be entitled to special constitutional protection (San Antonio School Dist. v Rodriguez, 411 US 1, 16). Accordingly, the appropriate standard is not the so-called strict scrutiny test or anything approaching it, but rather the traditional rational basis test. (Montgomery v Daniels, 38 NY2d 41, 59; cf. Matter of Jesmer v Dundon, 29 NY2d 5, app dsmd 404 US 953.)
A rational basis does exist for the distinction made in relieving the parents of blind and deaf children from any financial responsibility in connection with their children’s education while at the same time requiring parents whose children are otherwise handicapped to contribute to the maintenance component of educational expenses.
There can be no doubt that as a matter of history and *659 tradition our society has accorded special recognition to the blind and to the deaf in the field of education as elsewhere. In New York State since 1865 a school for the blind has been maintained by the State at Batavia (Education Law, art 87) and a school for the deaf at Rome[2] (Education Law, art 88). In addition there are five other schools for the deaf and five other schools for the blind subject "to the visitation of the commissioner of education” who has broad supervisory powers in the operation of such schools (Education Law, § 4201).
In the related field of social services, assistance to the blind has long been recognized as a special category (Social Services Law, art 5, tit 7, prior to repeal and consolidation with other categories by L 1974, ch 1080, § 4). Additionally the New York State Commission for the Blind and Visually Handicapped has a venerable and distinguished history (L 1913, ch 415, as amd; Social Services Law, § 38).
The Federal Government has also long accorded privileges and benefits to the blind which are not available to other handicapped persons—e.g., an additional exemption for income tax purposes (Internal Revenue Code, US Code, tit 26, § 151, subd [d]); disability benefits to the blind under the Social Security Act "without regard to ability to engage in any substantial gainful activity” (US Code, tit 42, § 423; 20 CFR 404.1501 [b]; see Ferguson v Celebrezze, 232 F Supp 952, 955-956); free mailing privileges (US Code, tit 39, §§ 3403, 3404).
We think that the Legislature acts rationally when, in the exercise of its authority and responsibility to identify concerns of the State and to make provision with respect thereto, it takes into account distinctions which carry the imprimatur of historical authenticity, provided that such distinctions are not. the reflection of invidious discrimination and have not been demonstrated to be irrational by knowledge subsequently acquired.[3] It strikes us as unintelligent to say that the decisions made in the past and the value judgments of those preceding us who were then responsible for identifying the *660 priorities of governmental concern and response must be wholly ignored unless the determinations which were then made can be justified, ab initio, when measured by today’s criteria and standards. This is not to say that we may today complacently accept the wisdom and the unwisdom of the past. It is to say, on the other hand, that the policy judgments and the priority determinations of our history are not totally to be rejected, especially when those judgments and determinations have enjoyed public acceptance for a long period of time. As we have said in another context: "While antiquity is not an infallible criterion for determining the scope of constitutional rights, traditional usage and understanding is helpful in defining the privilege against self incrimination”. (People v Samuel, 29 NY2d 252, 264.)
Our Legislature in granting the preferences to parents of the blind and deaf may well have judged at the time that children with these handicaps were more educable in general than were those with other handicaps. There may also have been other politically and educationally sound predicates for the choice. The resulting educational programs manifest the historical public recognition, understanding and acceptance of human disabilities. Government, and particularly the legislative branch, acts responsibly when it reflects the concerns and interests of the governed except when to do so would be to trespass on constitutionally protected rights. Obviously choices must and will be made; priorities must and will be set. This is the essence of the legislative process. Were the financial resources available to State government unlimited, this would not be necessary and might not be desirable. It would be unthinkable, however, to suggest that confronted with economic strictures State government is powerless to move forward in the fields of education and social welfare with anything less than totally comprehensive programs. Such a contention would suggest that the only alternative open to the Legislature in the exercise of its policy-making responsibility, if it were to conclude that wholly free education could not be provided for all handicapped children, would be to withdraw the benefits now conferred on blind and deaf children—thus to fall back to an undifferentiated and senseless but categorically neat policy that since all could not be benefited, none would be.
As the Supreme Court of the United States has written in *661 an associated context: "The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. Texas, 310 U. S. 141. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Dental Examiners, 294 U. S. 608. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A. F. of L. v. American Sash Co., 335 U. S. 538. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.” (Williamson v Lee Opt. Co., 348 US 483, 489.)
We conclude that there is a rational basis for the differentiation in treatment of the maintenance component of the educational expenses of blind or deaf children and children who are otherwise handicapped. (Matter of Claire, 44 AD2d 407, mot for lv to app dsmd 35 NY2d 706.)
As to the other branch of appellants’ equal protection arguments, it suffices to note that it is predicated on a false premise. There is no difference in the authority of the courts within and without New York City to direct a parent financially able to do so to contribute to the maintenance component of the expense of education of his handicapped child. Section 234 of the Family Court Act expressly grants the authority within the city. While it is true that no comparable articulation is to be found in present section 232, applicable outside the city, this has been described as a legislative oversight in the 1964 amendment and exercise of a comparable authority outside the city has been upheld as implicit in the power of the court to enter a "suitable order” under sections 232, 413, 414 and 416 of the Family Court Act (cf., also, § 415). Matter of Charilyn "N” v County of Broome, 46 AD2d 65, 66; Diana L. v State of New York, 70 Misc 2d 660, 665.)
The orders of Family Court should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Cooke concur.
In each case: Order affirmed, without costs.

. Two of the four appeals are from separate orders involving the same child, but for different school years.
One child suffers from "organic brain syndrome with secondary autism manifested by moderate mental retardation, hyperactivity and language impairment”; another from "schizophrenic reaction, childhood type”; and the third from "overanxious reaction of childhood with borderline features”.

. From 1887 to 1963 the New York school for the deaf was privately operated under State supervision.

. In passing we again observe that here we address classifications as to which the equal protection standard is that of rational basis. In instances of "suspect classifications” and "fundamental constitutional rights”, where special constitutional protection is assured by application of the strict scrutiny test, historical practice would not, of course, be accorded any such significance.