159 N.J. Super. 166 (1978)
387 A.2d 399
ROBERT G. GUEMPEL, INDIVIDUALLY AND ON BEHALF OF HIS DAUGHTER, LINDA J. GUEMPEL, A MINOR, PLAINTIFF,
v.
STATE OF NEW JERSEY, ANN KLEIN, COMMISSIONER OF THE DEPARTMENT OF HUMAN SERVICES, THE COUNTY OF MORRIS AND HELEN M. BROOKS, MORRIS COUNTY ADJUSTER, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 31, 1978.
*168 Mr. Joseph E. Irenas for plaintiff (Messrs. McCarter & English, attorneys).
Mr. Frederick M. English, Deputy Attorney General, for defendants State of New Jersey and Commissioner Ann Klein (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
Mr. Donald L. Berlin for defendants County of Morris and County Adjuster Helen M. Brooks.
STANTON, J.C.C. (temporarily assigned).
Plaintiff Robert G. Guempel is the father of Linda J. Guempel, a 17-year-old mentally retarded child who has been a resident at the Hunterdon State School since 1969. Pursuant to N.J.S.A. 30:4-165.3 and related statutes it has been decided *169 in previous proceedings that plaintiff is a legally responsible relative who must contribute to the costs of Linda's care in residential services in accordance with his financial ability. Because he is a highly successful business executive earning in excess of $100,000 a year, plaintiff has previously been ordered to pay the full per capita cost of Linda's maintenance, which currently amounts to about $12,000 a year. Plaintiff does not dispute the factual accuracy of the determination that he is able to pay that cost without undue hardship. However, he claims that N.J. Const. (1947) Art. VIII, § IV, par. 1, the "thorough and efficient" education clause, prohibits the State and county from charging him for the cost of Linda's care at the Hunterdon State School. He makes a similar claim based upon federal statutes and regulations dealing with the funding of programs for the education and rehabilitation of the handicapped.
Although the present action is not a class action under R. 4:32, there are many parents and other relatives throughout the State who are presently being required to pay all or some portion of the cost of maintaining residents at some seven state institutions for the mentally retarded. The ultimate outcome of this case may well have a significant impact upon their financial rights and obligations.
The "thorough and efficient" education clause of the State Constitution reads as follows:
The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children in the State between the ages of five and eighteen years. [N.J. Const. (1947), Art. VIII, § IV, par. 1]
Implementing legislation has gone beyond the minimum requirements of the State Constitution by extending the benefits of free public schools to persons between the ages of 5 and 20. N.J.S.A. 18A:38-1 et seq. The Legislature has divided mentally retarded children into three broad categories for educational purposes in N.J.S.A. 18A:46-9, which reads as follows: *170 Each child classified pursuant to section 18A:46-8 as mentally retarded shall be similarly further identified, examined and classified into one of the following subcategories:
a. Educable mentally retarded children, who are those who may be expected to succeed with a minimum of supervision in homes and schools and community life and are characterized particularly by reasonable expectation that at maturity they will be capable of vocational and social independence in competitive environment;
b. Trainable mentally retarded children, who are so retarded that they cannot be classified as educable but are, notwithstanding, potentially capable of self-help, of communicating satisfactorily, of participating in groups, of directing their behavior so as not to be dangerous to themselves or others and of achieving with training some degree of personal independence and social and economic usefulness within sheltered environments;
c. Children eligible for day training, who are those so severely mentally retarded as to be incapable of giving evidence of understanding and responding in a positive manner to simple directions expressed in the child's primary mode of communication and who cannot in some manner express basic wants and needs.
Local boards of education are responsible for providing an education to mentally retarded children who are educable or trainable. N.J.S.A. 18A:46-13. If adequate facilities and programs are not available within the local district, the local board must make arrangements to send the child, at the local board's expense, to a facility or program outside the district. All of this occurs without charge to the child or his relatives as part of the system of free public education. See N.J.S.A. 18A-46-14. If a child is so severely retarded that he falls into the category of being eligible for day training, the local board of education is not responsible for him. The local board may exclude him from its programs, in which case he becomes the responsibility of the State Board of Education and of the State Department of Human Services. N.J.S.A. 18A:46-17 and 18A:46-18.1.
It is undisputed that Linda is so severely mentally retarded that she is eligible for day training within the meaning of the statutory classification. This means that her care and education are the responsibility of the State Board of Education and of the State Department of Human Services. *171 It should be noted that the statutory classification of mentally retarded children into three groups differs from the generally accepted psychological classification of mentally retarded persons. The testimony in this case indicates that most psychologists who deal with the mentally retarded divide them into five categories. Starting with the highest level of intelligence as the first category, those categories are: (1) borderline retarded, (2) mildly retarded, (3) moderately retarded, (4) severely retarded and (5) profoundly retarded. A severely retarded person has an I.Q. in the range of 21-35. A profoundly retarded person has an I.Q. of 20 or below. Although the statutory classification and the general psychological classifications were developed independently and without conscious regard to each other, the expert witnesses in this case were in agreement that persons who are severely retarded or profoundly retarded would also happen to fall into the statutory classification of children eligible for day training.
The testimony in this case establishes that, under present arrangements made by the State Board of Education and by the Department of Human Services, a child eligible for day training is dealt with in one of two ways. If the total family situation is such that the child can live at home, the child is left with his parents and receives training, five days a week, in a day care center. The day care center attempts to teach the child simple living skills and habits. Also, just by taking physical care of the child for a number of hours each school day, the center provides the parents of the child, particularly the mother, with a desperately needed respite from the crushing burden of coping wih a severely or profoundly retarded child. The entire cost of the day care center program is borne by the State, without any charge whatever to parents or other relatives. At the present time the State pays approximately $5,500 a year for each retarded child in a day care center. Philosophically and financially, placement in a day care center is the preferred route and is used whenever feasible.
*172 The second way of dealing with a child eligible for day training is to place him in one of the state schools for the mentally retarded. The Hunterdon State School is one of seven such schools operated by the State of New Jersey. Persons attending the state schools reside in them on a full-time basis. The testimony in this case clearly establishes that the decision to place a retarded person in a state school is not based upon educational criteria. It is based upon the ability of the retarded person's family to handle him and keep him at home. If the family of a child eligible for day training cannot cope with him at home, he is placed in a state school.
The per capita cost of maintaining a resident in a state school for the mentally retarded is determined each year by the State House Commission, acting on the advice of the Commissioner of Human Services. The applicable statute authorizes the Commission to establish the rate either for a group of institutions or for single institutions. N.J.S.A. 30:4-78. In practice, the Commission has determined the cost separately for each of the seven state schools, and the cost does vary widely from one school to another. In determining the per capita cost the Commission takes the total cost to the State of running the institution and divides it by the number of residents. The term "total cost to the State" requires some explanation. It does not include any capital costs, any interest payments for capital borrowings, any depreciation for buildings and plant, or certain items designated as extraordinary items. Also eliminated from the calculation are expenses covered by federal grants. The State recognizes that part of the cost of operating the state schools is generated by educational activities which take place in the school. It also recognizes that under N.J. Const. (1947), Art. VIII, § IV, par. 1, and implementing legislation it may not assess against residents or their relatives the cost of supplying educational services to residents of school age. Accordingly, once the per capita cost has been determined as *173 stated above, it is adjusted or reduced to reflect education expenditures within the institution.
Educational costs are narrowly defined by the State in making the adjustment. They include salary costs for teachers, fringe benefits for teachers, educational supplies and the servicing, repair and replacement of educational equipment. The educational costs thus defined are divided by the number of residents under 21 years of age to obtain the educational per capita expenditure. The educational per capita cost is then subtracted from the per capita cost to produce the adjusted per capita cost. Subject to financial ability to pay, the adjusted per capita cost is then assessed against the resident or his legally responsible relative. For recent fiscal years the cost figures for residents at the Hunterdon State School have worked out as follows:

 Per capita Per capita Adjusted
 cost educational per capita
 cost cost
 1975 $10,170.67 $ 218.33 $ 9,952.34
 1976 10,699.45 370.40 10,329.05
 1977 11,397.19 332.47 11,064.72
 1978 12,704.99 309.68 12,395.31

Plaintiff argues that a severely or profoundly retarded child such as Linda has so many learning problems and disabilities that virtually everything done to her or for her has to be done by a professional person ("professional" here being broadly used to mean a nonparent of the child) and should be treated as an educational activity within the thrust of the state constitutional requirement that the State provide for the maintenance and support of a thorough and efficient system of free public schools. Thus, plaintiff argues that he should not have to pay anything toward the cost of caring for Linda at the Hunterdon State School, with the possible exception of a very modest amount for food, clothing and physical medical needs. In order to appreciate and evaluate plaintiff's argument, certain comparisons must be *174 made (or perhaps, more accurately, certain contrasts must be drawn) between the rearing and education of a normal child and the rearing and education of a severely or profoundly retarded child.
The normal child is taught to eat, to dress himself and to use the toilet by his parents in his home. He learns to understand and use the spoken word at home by observing his parents and siblings. A very considerable amount of socialization occurs unconsciously and automatically within the confines of the child's home. Thus, by the time a normal child arrives at his public school kindergarten class at the age of five, he is, broadly speaking, ready for instruction by professional teachers in what we usually think of as specifically academic subjects. (I realize that this statement does not do justice to the enormous effort which kindergarten and lower primary teachers must put forth in order to inculcate certain basic social skills, disciplines and habits in their school children, but the basic point is sound.) In short, although there is a sense in which a vast amount of education takes place at home from the first days of infancy, most people probably think of "education" as starting when the child is first sent to a formal school to be instructed in academic subjects by a certified professional teacher.
The situation of the severely or profoundly retarded child is vastly and sadly different. It is an enormously difficult task to get him to eat, to dress himself, to use the toilet. Frequently, these tasks cannot be accomplished by his parents. Sometimes they cannot even be accomplished after years of training by professional workers. The acquisition of simple communication skills may never occur and, if it does, it requires painstaking efforts by specially trained and highly motivated teachers. It should be noted that great strides have been made in the education and training of the upper levels of retarded persons (the borderline, mildly retarded and moderately retarded), and such persons can and do lead useful and productive lives with what would appear to be reasonable contentment and a fair measure of independence. *175 It should also be noted that it is now generally recognized by educators and psychologists that something meaningful can be done even for the severely or profoundly retarded child. Nevertheless, the present state of the relevant teaching and healing arts is such that the lot of the severely or profoundly retarded child must be described as a sorry and depressing one. The testimony in this case seems to indicate that if all goes well for the severely or profoundly retarded child, and if intensive professional attention is devoted to him, he may, after years of special help, approach having the level and kind of skills and habits we expect in a normal kindergarten child, and there appears to be no reasonable basis for him ever to aspire for anything beyond that. A succinct way of putting it would be to say that the achievement level (at best) of a severely or profoundly retarded child stops where that of a normal kindergarten child begins.
Because of the simple level at which the severely or profoundly retarded child functions, plaintiff would have us conclude that everything done to and with such a child should be treated as education. For example, the population at Hunterdon State School is divided among 18 residential buildings called "cottages," and a very sizable portion of the total institutional staff consists of personnel assigned to the cottages to exercise custody over the residents, to help them with eating, dressing, washing, going to the toilet and simple playing. There is also a staff group charged with more formal recreational programs. Plaintiff urges, in effect, that all of the people who help a retarded child to eat are educators. All who help him to dress or wash are educators. All who play with him are educators. Indeed, the house publications of the Hunterdon State School to some extent support this analysis since they require all residential and recreational staff members to foster the development of motor and sensory skills. In short, virtually every activity done should be treated as education. Thus, plaintiff argues that it should all come free as part of the thorough and *176 efficient system of free public schools required under the State Constitution.
Perhaps we can focus more sharply on this problem if we discuss Linda's background and present status, and the environment in which she lives at Hunterdon State School. Linda was born on November 6, 1960. When she was about a year old her parents noticed that she was developing much more slowly than had her two older brothers (both normal). Testing and evaluation followed. At the age of two Linda was diagnosed as being mentally retarded. Perhaps worse was the fact that she became increasingly hyperactive and self-destructive. Unless prevented, she would bang her head against walls, floors or furniture. She frequently scratched herself, tearing her skin. She had to be watched and monitored constantly, day and night. Needless to say, all of this placed a dreadful strain upon her parents and her brothers. Furthermore, there was nothing effective that they could do to train Linda at home. Accordingly, when Linda was four she was placed, at plaintiff's sole expense, in a private facility known as Van Hook Walsh School in Middletown, Delaware.
Plaintiff testified that Linda made progress at Van Hook Walsh. She showed marked improvement in feeding, dressing and getting to the toilet. She learned to ride a swing and a tricycle. She was able to sing simple songs imitatively, although I gather that the words meant nothing to her. Unfortunately, despite the progress, Linda continued to be hyperactive and self-destructive. In 1969 the Van Hook Walsh School asked Linda's parents to take her out of the school  she was too difficult a case for the school to handle. She was admitted to the Hunterdon State School in October 1969 and has stayed there ever since, with the exception of several stays in Trenton Psychiatric Hospital. The expectation is that she will remain in Hunterdon for the rest of her life.
There are approximately 1,000 residents at the Hunterdon State School. About 550 of them are less than 21 years of *177 age. The population is divided among 18 residential cottages which are segregated by sex and, to some extent, by functional characteristics of the residents. All of the residents in Linda's cottage are persons with difficult behavioral problems. Most of Linda's time is spent in her cottage and in a play area attached to her cottage. There are some formal educational facilities in special buildings at the Hunterdon State School which are attended by some of the higher level residents. Linda has never been in a formal educational program at Hunterdon. This is due to a traditional shortage of professional teaching staff at the institution. Apparently, the services of the few professional teachers available have been directed to the relatively higher level residents on the theory that those children could derive the most benefit from them. Fortunately, there has recently been a substantial infusion of educational funds into Hunterdon (not reflected in the cost data set forth hereinabove) and the personnel of the Education Department at the institution has been increased from 25 to 81. For the first time, a full-time professionally certified teacher has been assigned to Linda's cottage. That teacher is now evaluating all of the residents of the cottage and attempting to design a program for each of them which can then be implemented. The expectation is that Linda will soon receive some assistance from the cottage teacher.
When Linda first came to Hunterdon, her I.Q. was estimated to be in the 20-35 range, which would put her in the severely retarded category. More recent evaluations place her I.Q. at under 20, which would place her in the profoundly retarded range. These variations do not necessarily indicate a real change or a regression. Because of the extremely simple intellectual level at which Linda functions, she cannot be given the kind of sophisticated written intelligence test which a normal child her age would be given. Indeed, she cannot even be given the kind of oral verbal test sometimes given to very young normal children. The tests she has received are extremely simple *178 and rather crude. Accordingly, the shift in scores may reflect nothing other than the range of scoring error inherent in testing at this level. On the other hand, it should be noted that plaintiff's testimony about his observations of Linda over the years contains a number of indications that she has actually regressed. Be all that as it may, the indisputable fact is that Linda's intelligence level is very low; she is at least severely retarded, and she may very well be profoundly retarded.
Although Linda has nothing wrong with her vocal organs, she does not speak at all. Her hearing is good, but she does not understand normal conversation. She does, however, respond to simple verbal commands which are directed specifically and carefully at her. She frequently bangs her head and usually wears a football-type helmet to protect against that habit. She frequently tears her skin by scratching. She is not fully continent. She requires assistance with bathing, dressing and eating.
With the consent of counsel, I made an unaccompanied visit to Linda at her cottage on a Saturday afternoon while the trial was pending. My visit took place in mid-afternoon in the main living area of the cottage. Linda was not wearing a helmet, but she was wearing a restraint commonly known as a straitjacket. The shift supervisor of the cottage told me that the restraint had been placed on Linda that morning because she had been scratching herself badly. I observed fresh scratch marks on her face. There were many healed scars on Linda's face and neck. She was neatly and cleanly dressed. Her size and general appearance were normal, except that she had the blank facial expression common among the severely and profoundly retarded. She was unable to speak or to understand my conversation. However, when I asked her by words and gestures to walk to a couch and sit down with me, she did so. I was able to elicit a smile from her.
Most of the cottage residents were present in the large living area in which I was visiting with Linda. The room *179 and its furnishings were simple, clean and neat. The residents were clean. The social scene was extremely disorderly. (I might note that this characterization does not reflect "culture shock" on my part. I have made a number of visits to residents at Hunterdon and other state schools for the mentally retarded on other occasions, and I have also had extensive direct exposure to conditions on many psychiatric wards. I have never seen as much troublesome activity as I saw in Linda's cottage during my visit.) Although some of the residents were sitting, lying down or playing quietly, many were walking around quickly but aimlessly. Some were bumping into each other or into the walls or furniture. One kept trying to undress. Several residents were fighting. It should not be inferred from this that the cottage staff was not watching the residents carefully. The vigor and diligence of the several young women on duty were impressive. They were in constant motion and intervened promptly in every troublesome situation. It was obvious to me that Linda's cottage is inhabited by residents who have significant behavioral problems in addition to the basic mental retardation problem afflicting all of the residents at Hunterdon.
In addition to the limited observations of the conditions at Hunterdon State School which I made during my visit with Linda, I heard extensive testimony about the institution and its activities during this trial. I was also presented with a number of factual stipulations and with considerable documentary evidence about the institution. Fully 93% of the residents are severely or profoundly retarded, while the remaining 7% suffer from lesser degrees of retardation. At one time the average intellectual level was higher. However, such progress has been made in educating the higher levels of retarded children in recent years in this State that most retarded children can now be educated outside of residential institutions and can continue to live with their families. This, of course, is a generally happy development, but it has had a negative influence upon the *180 Hunterdon State School in the sense that the institution is now pretty much exclusively an institution for the severely and profoundly retarded. The average resident at Hunterdon is becoming more difficult to educate and train.
The evidence in this case satisfies me that Hunterdon State School does a commendable job in attending to the physical needs of its residents. It seems to provide them with a safe, clean, emotionally supportive environment. All of this is no mean achievement, considering the people with whom it is dealing. I am not nearly so impressed with the educational achievements of Hunterdon. This is not to criticize the energy, dedication or skill of those at Hunterdon who have been working as teachers in the institution's Education Department. But the fact is that until very recently the resources committed by the State to the institution's Education Department have been meager. It may also be that not much can effectively be done on a large-scale basis with the severely and profoundly retarded, even if resources are committed. There are grounds for hope in the professional literature. The testimony of plaintiff's expert, Dr. Sandra L. Harris, was optimistic and encouraging, and the work which she is doing with severely retarded children at her special school at Rutgers University is impressive. Nevertheless, it is not at all clear that a child such as Linda would actually be significantly helped by the intensive application of educational and training techniques and resources. What does seem clear is that, because Linda is a deeply unfortunate and deprived human being, we owe it to her and to our own sense of decency and humanity to make a serious and sustained effort to help her through education and training.
In the course of presenting plaintiff's case, plaintiff's attorney indicated that in some future action plaintiff or others similarly situated might question the adequacy of the education being supplied to persons such as Linda and might seek to compel the application of additional *181 state resources to this situation. However, it is clear that the question of the adequacy of what is being done for Linda is not raised in the present case. Plaintiff's argument in this case is that virtually everything done for Linda at Hunterdon (whether it be good, bad or indifferent) is education within the meaning of state constitutional rules and should be supplied without charge to plaintiff. As a matter of broad philosophy and abstract theory, there is something to be said for plaintiff's position. On the other hand, without meaning to sound harsh or insensitive, as a matter of broad philosophy and abstract theory, there is something to be said for the proposition that Linda's intellectual endowments are so limited that the State is excused in her case by reason of impossibility from its general constitutional obligation to supply a thorough and efficient system of free public schools for the instruction of all children. When all is said and done, abstract theory and broad philosophy, although often helpful, do not take us very far in interpreting constitutional or legislative provisions.
I am satisfied that, as a matter of fact and as a matter of realistic characterization, the Hunterdon State School, despite its title, is not primarily an educational institution. It is primarily an institution for the care, custody and safekeeping of mentally retarded persons of all ages (not just school age) who cannot live in safety with their families because of their mental deficiencies and problems flowing therefrom. The educational role of the institution is secondary to its care, custody and safekeeping roles. As an individual person and citizen, I would like to see the Executive and Legislative Branches of State Government commit significantly greater resources to the educational role of the Hunterdon State School and similar institutions, but nothing presented in this case entitles me as a judge to order the commitment of any additional resources to the education of Linda or other retarded children.
*182 So far as the specific state constitutional issue raised in this case is concerned, I conclude that N.J. Const. (1947), Art. VIII, § IV, par. 1 does not require the Legislature or the State to provide any care, custody or safekeeping services to Linda, much less to provide them without cost to Linda or her parents. Linda does have a statutory right to care, custody and safekeeping services under N.J.S.A. 30:4-165.1 et seq., and other statutes, but that right is subject to the duty of her estate and her legally responsible relatives to pay for the cost of such services to the extent that they are financially able to do so. N.J.S.A. 30:4-165.3.
I find that the decision to admit Linda to the Hunterdon State School was not made for educational reasons or pursuant to any educational criteria. Linda was admitted to Hunterdon because her parents were unable to provide for her basic life needs and care at home. In saying this, I do not slight Linda's parents in any way. They are intelligent, decent and concerned parents. The sad fact is that Linda's problems and needs are so great that her parents could not reasonably be expected to deal with them within the confines of their home.
There have been some cogent criticisms of deficiencies and inequities existing in the current New Jersey system for determining the per capita costs for residents of state schools for the mentally retarded and for assessing those costs against residents of the institution or their relatives. See the Program Analysis of Institutional Maintenance Support Payments, volumes I and II, issued by the Office of Fiscal Affairs, New Jersey State Legislature, February 1974.
Despite its imperfections, I am satisfied that the practice (previously described in this opinion) of determining per capita cost for the Hunterdon State School, of making deductions against that cost for certain education expenses, and of then fixing an adjusted per capita cost which is assessed against the resident or his family, subject to ability to pay, is authorized by statute, is broadly equitable and is not prohibited by N.J. Const. (1947), Art. VIII, § IV, *183 par. 1. See Kough v. Hoehler, 413 Ill. 409, 109 N.E.2d 177 (Sup. Ct. 1952), and In re Reiver's Estate, 343 Pa. 137, 22 A.2d 655 (Sup. Ct. 1941), both of which uphold the general concept of calculating costs on a per capita basis rather than requiring proof of cost of benefits actually furnished to a particular individual.
Some comment about the role of defendants County of Morris and Helen M. Brooks, the Morris County Adjuster, is appropriate at this point. When a resident in a state school for the mentally retarded has a legal settlement (residence) in a particular county, that county is liable under the applicable statutory scheme for half of the expense of maintaining him in the institution, subject to possible right of reimbursement by the resident or his relatives. Linda has a legal settlement in Morris County. The County Adjuster is obligated by statute to conduct a hearing to determine the legal settlement of the resident and to determine the ability of the resident or his family to pay. N.J.S.A. 30:4-165.3. The County Adjuster's findings and recommendations are then reported to the appropriate court for approval. If approved by the court, those findings and recommendations end up as a binding court order fixing the obligation (or lack of it) to pay. The County Adjuster then attends to the mechanics of collecting the sums due and remitting them to the State Treasury. In determining ability to pay, the County Adjuster relies on guidelines issued by the State. (The County Adjuster fulfills a similar role with respect to patients in state psychiatric hospitals. See N.J.S.A. 30:4-46). Plaintiff concedes that the state guidelines are factually fair, that the County Adjuster applied them accurately, and that her findings of fact were correct. Accordingly, plaintiff has no real quarrel with the County of Morris and the County Adjuster. He has made them parties simply because they are links in the chains of cost assessment and collection, and he wants them to be bound by the judgment entered in this case.
In addition to his claims under the New Jersey Constitution, plaintiff asserts that the federal Education of the *184 Handicapped Act, 20 U.S.C.A. § 1401 et seq., and the federal Rehabilitation Act of 1973, 29 U.S.C.A. § 701 et seq., prohibit the State from charging plaintiff for the cost of Linda's care at the Hunterdon State School. These statutes make federal funds available to states for the education and training of handicapped persons, subject to certain standards and conditions. New Jersey receives funds under both statutes.
With respect to the Education of the Handicapped Act, plaintiff points to 20 U.S.C.A. § 1412, which establishes a goal of providing free appropriate public education to all handicapped children regardless of the severity of their handicap. The record in this case does not establish any failure of the State to meet that goal. Furthermore, the date fixed by the statute for meeting that goal is September 1, 1978, making plaintiff's claims premature.
With respect to the Rehabilitation Act of 1973, plaintiff relies particularly upon regulations promulgated under the act by the Secretary of Health, Education and Welfare on June 3, 1977. 45 Fed. Reg. 22676 et seq. Section 84.33(c) of those regulations provides in pertinent part:

Free education. 
(1) General. For the purpose of this section the provision of a free education is the provision of educational and related services without cost to the handicapped person or to his or her parents or guardian. * * *

* * * * * * * *
(3) Residential placement. If placement in a public or private residential program is necessary to provide a free appropriate public education to a handicapped person because of his or her handicap, the program, including non-medical care and room and board, shall be provided at no cost to the person or his or her parents or guardian.
The appendix to the regulation supplies this amplification to § 84.33:
If the recipient [that is, the grant-receiving State] places a student, because of his or her handicap, in a program that necessitates his or her being away from home, the payments must also cover room *185 and board and non-medical care (including custodial and supervisory care). When residential care is necessitated not by the student's handicap but by factors such as student's home conditions, the recipient is not required to pay the cost of room and board.
I find that Linda has not been placed as a resident in Hunterdon State School for the purpose of providing her with a free appropriate public education. The residential placement is not an incident to her education. She has been placed in Hunterdon because she cannot receive basic life care at home. I interpret § 84.33 as covering only those residential placements which are incidental to an educational program, and I conclude that the regulation does not preclude the State from recovering from plaintiff the cost of the custody, care and safekeeping of Linda.
Furthermore, it seems to me that plaintiff cannot assert direct rights under the federal Education of the Handicapped Act and the federal Rehabilitation Act of 1973 in a proceeding such as the present one. As stated above, I do not find that the State has violated any provisions of the federal statutes or related regulations, but even if it has, I believe that the consequence would be the loss of federal funds rather than the right in plaintiff to a monetary set-off in a state court proceeding.
In his main trial brief plaintiff made some rather complicated arguments to the effect that New Jersey's system for identifying the mentally retarded, institutionalizing them and financing their care violated the due process requirements of the United States Constitution as well as the Equal Protection Clause. Plaintiff's brief also questioned the basic per capita method of determining cost and the validity of the state guidelines for establishing ability to pay. I think it fair to say that plaintiff intentionally abandoned all of these positions during the course of the trial. Plaintiff's abandonment of those positions aside, I find no merit in any of them as originally posed by plaintiff.
However, I do find that the method of assessing institutional costs to plaintiff in this case does violate that *186 portion of the Fourteenth Amendment to the United States Constitution which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." My holding in that regard is based upon an analysis which is different from that raised by plaintiff.
I do not accept plaintiff's contention that New Jersey's classification of handicapped and mentally retarded persons constitutes a "suspect" class within the meaning of equal protection rules. The significance of the "suspect" class concept is clearly set forth by the New Jersey Supreme Court in Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976):
The federal equal protection clause does not require that government treat all persons identically. It requires only that differences in treatment of persons similarly situated be justified by an appropriate state interest; such distinctions may not be irrational or discriminate invidiously. [Citing case.] Under the conventional `two-tiered' analysis applied by the United States Supreme Court, the burden is on the party attacking the classification to show that it lacks a rational relationship to a legitimate state objective. The notable exception to this test occurs in situations where the classification involved "suspect" criteria or impinges upon "fundamental" rights. In these cases the burden is on the State to show that the classification serves a "compelling state interest". [Citing cases.]
The only rights which are "fundamental" in this regard are those expressly guaranteed or clearly implied by the federal constitution. [Citing case.] [at 280-281]
Plaintiff argues in his brief that the mentally retarded are a "suspect" class and cites cases dealing with classification by race, sex and illegitimacy. I do not accept plaintiff's argument. It seems clear to me that the classification of mentally retarded children contained in N.J.S.A. 18A:46-9 does not involve any invidious characterization of the mentally retarded. It is based upon objective differences which are functionally significant. This is particularly true with respect to severely and profoundly retarded children who are classified as "children eligible for day training" under N.J.S.A. 18A:46-9(c). Such children are completely *187 helpless, not only as very young children but throughout their entire lives. It is not only functionally useful but, indeed, functionally imperative that such children be identified and targeted for special treatment and protection. Without identification and classification, and without resultant special treatment and protection, these children could not survive. They are the very opposite of a "suspect" class. Furthermore, the right to a free education is not a "fundamental constitutional right" under the Federal Constitution. See Levy v. City of New York, 38 N.Y.2d 653, 382 N.Y.S.2d 13, 345 N.E.2d 556 (Ct. App. 1976).
As stated previously in this opinion, the State recognizes an obligation to supply specifically educational services without charge to retarded children such as Linda. Consequently, after calculating the basic per capita cost for residents of the Hunterdon State School, the State then calculates the expense of providing specifically educational services to the residents, and then deducts that expense from the basic per capita cost, arriving at an adjusted per capita cost which is then charged to the resident or his relatives, subject to ability to pay. In calculating educational expense the State uses a narrow definition of such expense, including in it only teachers' salaries, teachers' fringe benefits, educational supplies and the servicing, repairing and replacement of educational equipment. The educational expense calculation includes no allocation whatever of the general institutional expenses for maintenance of grounds and building, utilities and fuel, salaries and fringe benefits of personnel other than certified teachers, psychological services, secretarial services, staff training, legal services, insurance, printing, or general management and administration. In terms of generally accepted accounting principles, it does seem plausible that some portion of the general institutional expenses just mentioned should be attributed and allocated to Hunterdon's Education Department if one were seeking to calculate the full and realistic educational costs of the institution. Plaintiff points out that in the ordinary public *188 school the school budget, in addition to covering teachers' salaries, teachers' fringe benefits, educational supplies and the servicing, repairing and replacement of educational equipment, contains sizable expenditures for items such as janitorial services, security, utilities, heat, secretarial services, psychological services, school nursing services, insurance, printing and general management and administration. The entire budget of the ordinary public school is paid for out of public funds, and no parent (even though he be in the super-rich category) of any child in the school is asked to pay one penny by way of tuition or other fee. Plaintiff argues that the children in the state school for the mentally retarded and their parents are not getting treatment and protection equal to that afforded to children in ordinary public schools and their parents.
There is some point to plaintiff's argument. On the face of it, the State's calculation of education expense in schools for the mentally retarded does seem to be unduly narrow and restricted. On the other hand, there is a vast difference between what goes on in a school for the mentally retarded and what goes on in an ordinary public school. Despite its name, a state school for the mentally retarded is not primarily a school. It is primarily an institution for the care, custody and safekeeping of mentally retarded persons of all ages. It has an educational role. That educational role is important, and that role will in the future undoubtedly receive greater emphasis than it presently receives. Nevertheless, even assuming fully adequate attention by the State to the educational role of the state schools for the mentally retarded, I am satisfied that the educational role of those institutions will always be decidedly secondary to the care, custody and safekeeping functions of those institutions. Hence, there is no real comparison to be made between the ordinary public school and a state school for the mentally retarded and no valid analogy to be drawn between the budgeting and accounting practices and allocations of the respective institutions. *189 Consequently, I do not believe that the equal protection concepts of the Fourteenth Amendment of the United States Constitution come into play as between state schools for the mentally retarded (and their residents and families) and ordinary public schools (and their pupils and families).
The same is true so far as the more demanding equal protection standards of the State Constitution are concerned. N.J. Const., (1947) Art. I, pars 1 and 5. The New Jersey Supreme Court frequently requires public authority to show a greater "public need" than is usually required in construing the United States Constitution. It must be shown that there is an "appropriate governmental interest suitably furthered by the differential treatment." Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra, 71 N.J. at 286, which in turn quotes from Collingswood v. Ringgold, 66 N.J. 350, 370 (1975). There is an ancient and firmly established public policy in New Jersey of requiring residents (patients) in state institutions for the mentally retarded and in state mental hospitals, and their families, to pay for the cost of basic care in those institutions, if they are able to do so. That policy is set forth in N.J.S.A. 30:4-165.3 and N.J.S.A. 30:4-46 and predecessor statutes. Incidentally, that policy is widespread throughout the United States. See Beach v. District of Columbia, 116 U.S. App. D.C. 68, 320 F.2d 790 (D.C. Cir.1963). That significant and valid policy is furthered by according Executive Branch officials broad managerial discretion in making accounting allocations, particularly when, as here, the allocations are consonant with the basic purpose and nature of the institution involved. That significant and valid policy would inappropriately be hindered by judicial hairsplitting and nitpicking in making accounting allocations.
The comparison between the state school for the mentally retarded and the ordinary public school is not meaningful and does not implicate any constitutional doctrines. However, when we compare the treatment afforded to severely *190 and profoundly retarded children who are assigned to day care centers to that afforded to severely and profoundly retarded children who are placed in residence in the state schools for the mentally retarded, we encounter significant equal protection problems. Under N.J.S.A. 30:4-165.2 services provided for mentally retarded children are divided into two basic categories: nonresidential functional services and residential functional services. As stated earlier in this opinion, the division into nonresidential and residential services is not based upon educational criteria. It depends, essentially, upon the total home situation of the retarded child and the impact of his handicap upon that situation. If the child requires residential functional services, he is placed in a state school for the mentally retarded and, under N.J.S.A. 30:4-165.3, he and his family become responsible for paying the full cost of his care, custody and safekeeping (less a modest adjustment for educational expenses narrowly defined), subject to ability to pay. If the child requires only nonresidential services, he receives day training in a day care center established by the State Board of Education and the State Department of Human Services pursuant to N.J.S.A. 18A:46-18.1.
The testimony in this case establishes that what occurs to the severely profoundly retarded child within the day care center is essentially the same as what occurs to the severely or profoundly retarded child within a state school for the mentally retarded. (It should be kept in mind that both residential and nonresidential groups of such children are "children eligible for day training" under the educational classification established in N.J.S.A. 18A:46-9c.) In both the day care center and the residential state school for the mentally retarded, there is relatively little "education" in the normal academic sense of that term. The basic functions of both institutions are in the areas of care, custody and safekeeping. The difference between them is that the care, custody and safekeeping functions of the day care center are performed five days a week during school hours, whereas *191 the state school performs those services 24 hours a day, seven days a week. In short, both institutions do the same thing, but the state school does it for a longer period of time.
In terms of financial responsibility, the role model for the day care center has been the ordinary public school. Thus, no charge whatever is made to children or their families with respect to what occurs within the day care center. The entire expense of all center operations is paid out of the public treasury. In the last fiscal year day care center services worth $5,500 were supplied, completely free of charge, to the severely or profoundly retarded child assigned to the day care center. That situation contrasts sharply with what was done to Linda and her parents during the last fiscal year. The basic per capita cost of her care at Hunterdon State School was $12,704.99, against which she was given an educational expense credit of $309.68, with the result that she and her parents were expected to pay $12,395.31 for her care, custody and safekeeping. I see nothing invidious about dividing severely and profoundly retarded children into nonresidential and residential groups depending upon total family situation, but I do see something constitutionally invidious about giving the nonresidential child what amounts to a $5,500 educational expense credit, while giving a residential child such as Linda an educational expense credit of only $309.68. There is no reasonable basis for this difference in treatment between the two groups of retarded children. There is no appropriate governmental interest suitably furthered by it. The difference in treatment amounts to a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and of the equal protection concepts embodied in N.J. Const. (1947) Art. 1, of pars. 1 and 5.
I hold that under state and federal equal protection concepts, residents in state schools for the mentally retarded must be given a deduction against their per capita costs equal to the average per capita statewide sum being spent on a year-to-year basis for mentally retarded children in *192 the day care center program. If the age of the resident in a state school is such that he would not be receiving day care center training if he were not a resident in the state school, he would not be entitled to that deduction.
Plaintiff's attorneys are requested to submit a judgment modifying plaintiff's financial obligations for the years covered by this proceeding to reflect the deductions to which he and Linda are entitled under the holding of this opinion. No court costs are awarded.
I am aware that the impact of the present decision will be limited to the more affluent families of children who are residents of state schools for the mentally retarded. The reason for this is that the state guidelines for measuring ability to pay take liberal account of the general financial burdens and obligations of relatives of residents. Very few parents pay the full amount of the adjusted per capita cost for the care of their children. Thus, at Hunterdon State School, out of a population of 1,000 residents, the families of only four residents pay the full adjusted per capita cost of care. Statewide, less than 10% of the total cost of care is recovered from residents or their families. (The amount of dollars collected is, nevertheless, significant, since the cost of care is large. The annual cost of operating Hunterdon, for example, is on the order of $10,000,000.) Many more than 10% of the families of residents contribute to the cost of care, but most families which contribute pay far less than adjusted per capita cost. Statewide figures were not presented to me, but data supplied by the County Adjuster of Morris County indicate that Morris County has 270 of its citizens who are residents in state schools for the mentally retarded. Parents or other relatives are making payments with respect to 128 of those residents. The total amount collected from relatives (including some amounts channelled through Social Security) for the last year was $207,496.38. Thus the average payment per resident for Morris County residents was $1,621.06, which is only a small portion of the adjusted per capita cost for each *193 resident. As a practical matter, therefore, the most significant limitation on the amount paid by the average parent of a state school resident is the parent's financial ability to pay, rather than the cost of the care. So far as current payments for residents at Hunterdon State School are concerned, this decision will have impact only upon that relative handful of parents who are actually paying more than $7,204.99 a year ($12,704.99, current per capita cost, less $5,500, the current day care center per capita cost).
Equal protection of the laws does not require that the practical impact of legal rules be equal upon all involved persons. It requires that the same legal rules apply to all persons similarly situated and that they be applied in a consistent manner. Once the State decides to operate a system of free public schools, then all parents, regardless of financial means, are entitled to have their children educated without being charged for the education. Once the State decides to supply $5,500 worth of care to severely and profoundly retarded children in day care centers without charging any parent of any affected child for that care, regardless of the financial means of that parent, then all parents of severely and profoundly retarded children are entitled to $5,500 worth of comparable care, without paying for it, and regardless of financial ability to pay. If the State decides (as it has through the enactment of N.J.S.A. 30:4-165.2) to charge parents for the cost of services rendered in addition to what is available in the day care center program, subject to ability to pay, it may do that, provided that the means test applied is reasonable in its terms, and provided it is applied fairly and consistently.