*973 OPINION OF THE COURT
Henry A. LaRaia, J.
A verified petition pursuant to section 236 of the Family Court Act was filed by Tiífiny S., mother of the infant, Thane S., Jr., on January 2, 1992. That petition, indicating that early childhood special education was requested, was based on the statement that the infant was a handicapped child "as defined in subdivision one of section 4401 of the Education Law, in that (s)he has been found to be Visually Impaired”. Petitioner requested payment of tuition to the Herkimer County BOCES Early Childhood Special Program in the amount of $8,000 for attendance from October 28, 1991 through June 24, 1992. The petition was approved by Donald R. Covell, representative of the Mount Markham School District, the district in which the child resided; William H. Thomas, M.D. and Anthony S., a psychologist (not related to the petitioner).
The County of Herkimer by the Chairman of its Legislature, Ronald N. Soltys, duly filed a reply requesting that the asked for relief be denied.
At the hearing commenced on June 15, 1992 and continued on August 18, 19, and 20, 1992 and January 29, 1993 the petitioner infant represented by court-appointed Law Guardian, William L. Koslosky, Esq., and the respondent County represented by County Attorney, James Collins, Charles E. Crandall, Jr., Esq. of counsel, stipulated that the said infant was blind from birth, it being recognized that the child suffered from Norrie’s Disease which rendered him blind at birth on September 13, 1991.
The essential question which is presented to the court by this proceeding is whether under section 236 this infant was in need of special educational services.
The County of Herkimer (hereinafter respondent) contended that the determination that the child was in need of special educational services was based upon an inadequately performed assessment by a multidisciplinary team from the Herkimer County BOCES performed when the child was approximately IVi weeks of age. It should be noted also that the assessment team was from the same organization which subsequently rendered the special services to the child.
The respondent’s expert witness, David Coron, Ph.D., testified extensively on his opinion and reasoning that the BOCES team could not have performed an adequate assessment using the methods employed. He also testified that the better proce *974 dure would have been to use other more specific tests (or "assessment tools”), such as the Bayley Infant Scales; Catell Assessment; Denver Developmental Screening Test; Developmental Assessment for Severely Handicapped; Portage Assessment; Gasell Assessment and Brigance Diagnostic Inventory of Early Development, or combination thereof.
Petitioner on the other hand pointed out that no one or combination of the above-mentioned tools is specifically designed for determination of the capabilities, or lack thereof, of a seven-week-old blind child.
Respondent countered that notwithstanding, the employment of several of the said tests would have permitted the team "to gain a wider range of behavioral samplings which could then be compared to various types of norms or criteria”, and contended that the team should have observed the child in more than one setting, over a period of days and when the child was awake rather than asleep. Further, that based upon those observations "you would want to compare him to a normative population, if you could have children of the same age to see how he compares developmentally to children of the same difficult age. You would want to continue those assessments periodically to see how he was faring against the norm”.
In answer to the court’s questions Dr. Coron indicated that even though it was his opinion based on his review of the performed assessment "that they were grossly inadequate and do not support the disability for which you would then authorize the services”, he could not say that a child blind from birth would not need special services even at seven weeks, notwithstanding the lack of the more thorough assessment which he advocated.
In answer to the court’s question "so I guess my real question is, had there been a correct substantiation, in all likelihood — in your medical opinion — there may be a likelihood that the child would have needed the services?”, he answered, "I would have to say that would be correct”.
Petitioner’s expert, Sandra Demyer-Gapin, Ph.D. of Psychology indicated that in her experience in assessing blind children no particular tests could be employed because when dealing with infants "[i]t really boils down, particularly when you’re dealing with very young babies, much more of a clinical judgment, clinical assessment. Most of the tests that we have for assessing infants are woefully inadequate”.
*975 Further she indicated that in addition to assessment tools an evaluative analysis can be based on general knowledge of child development, infant development, the physical appearance of the child, what the parents indicate as to the child’s temperament and behavior; "just a combination of things”, including the accepted knowledge based on a substantial body of literature that "indicates to us that blind children or severely visually impaired children do not develop in the same way as other children do”.
It was Dr. Gapin’s opinion that based upon a review of the submitted infant assessment and individual family service plan prepared by the BOCES assessment team that the infant in question required intervention as "there are enough indicators in here that this is a child who clearly is showing some developmental delay, and just the blindness itself automatically makes the child high risk and entitled to services”.
Based upon a thorough review of the evidence and the applicable statutory and case law the court denies the respondent’s objections and approves the petition in accordance with the following:
There is no question that the Family Court, at the time of this petition, had jurisdiction for approval of petitions for services to handicapped children of this age group under Family Court Act § 236. That section grants the court authority under certain conditions to approve services to children with handicapping conditions as defined in subdivision (1) of Education Law § 4401. The latter section, effective until June 30, 1993, specifically provided that a child with handicapping conditions is entitled to receive appropriate educational opportunities from a program of special education; special education was defined to include special services; subdivision (2) of that section defines special services in paragraph (k) as also including related services of "audiology, counseling, occupational therapy, physical therapy, speech pathology, medical services * * * psychological services, and other appropriate support services”.
The courts of this State have long recognized the necessity of providing "related services” to the handicapped child. (See, McGaw v Huntington Hosp., 89 AD2d 38.) Likewise, the courts have also long confirmed the legislative policy to extend those services to children even though not of an age which would permit them to attend school. In Matter of David JJ. (129 AD2d 355, 357-359) Mr. Justice Weiss of the Appellate Divi *976 sion, Third Department, wrote in 1987 in reversing a lower court determination that physical therapy and speech therapy were not "special educational services” in the case of an orthopedically impaired preschooler within the meaning of Family Court Act § 236:
"There is no question that David would be entitled to these services, free of charge, if he were of school age. Handicapped children are constitutionally and statutorily entitled to a free education specially designed to meet their individual needs (NY Const, art XI, § 1; 20 USC § 1400 et seq.; Education Law §§ 4401-4409; see, Matter of Levy, 38 NY2d 653, appeal dismissed 429 US 805; McGaw v Huntington Hosp., 89 AD2d 38, 43). The Federal Education for All Handicapped Children Act of 1975 entitles handicapped children to 'a free appropriate public education which emphasizes special education and related services designed to meet their unique needs’ (20 USC § 1400 [c]; emphasis supplied; see, Irving Ind. School Dist. v Tatro, 468 US 883). By definition, 'related services’ expressly includes speech pathology and physical and occupational therapy, as well as the early identification and assessment of handicapping conditions (20 USC § 1401 [a] [17]). Similarly, Education Law article 89 specifically provides that a handicapped child is entitled to the therapeutic services in question (see, Education Law § 4401 [2] [k]; McGaw v Huntington Hosp., supra, at 43-44). * * *
"It is important to recognize that the Legislature defines a handicapped child in terms of the programs or services [which] will enhance that child’s educational opportunities. At the initiation of this proceeding, a school-age handicapped child was defined as one who could 'receive appropriate educational opportunities from special services and programs’ (Education Law former § 4401 [1]; emphasis supplied). The [italicized] phrase was defined to include, inter alla, 'related services’ such as physical therapy and speech pathology (Education Law § 4401 [2] [k]). The Legislature has since redefined a 'child with a handicapping condition’ as one who could 'only receive appropriate educational opportunities from a program of special education * * * "special education” means specially designed instruction which includes special services or programs * * * and transportation, to meet the individual educational needs of a child with a handicapping condition’ (Education Law § 4401 [1], as amended by L 1986, ch 53, § 56, eff July 1, 1986; emphasis supplied). In effect, 'special services and programs’ has been redefined as a 'program of special educa *977 tian’. The Legislature has thus authorized a 'program of special education’ for school-age children and 'special educational services’ for preschoolers. Although we recognize that the Family Court Act, unlike the Education Law, does not describe all the services available in detail, the definitional language for a handicapped child is virtually interchangeable (see also, Education Law § 4401-a, as added by L 1986, ch 53, § 57). It follows that by definition the term 'special educational services’, as utilized in Family Court Act §236 (2), readily extends to related services such as physical and speech therapy.”
As relates to the instant case before this court three very relevant points in the above discussion are readily discernible: (a) that the Legislature intended that preschoolers be provided with services which would enable them to take full advantage of the special programs that are available when they do become of an age where they can take advantage of those special programs; (b) that the "related services” of Education Law § 4401 (2) (k) are to be provided in securing the objectives mentioned in (a) above; and (c) "[b]y definition, 'related services’ expressly includes * * * the early identification and assessment of handicapping conditions.” (See, Matter of David JJ., supra, at 357.) And, "[finally, the enactment of Family Court Act § 236 contemporaneously with Education Law article 89 highlights a legislative recognition that the early detection and treatment of preschool handicapped children enhances their educational potential (see, Matter of J. F., 91 Misc 2d 445, 449-450)”. (Matter of David JJ., at 359-360.)
In the latter cited case, the court discussed Public Law 94-142 (89 US Stat 773) indicating that the purpose of congressional passage of that law was, in part, to encourage the States to provide free special educational services to preschool age handicapped children. "As Senate Report 94-168 states (p 19): 'The Committee further believes that identifying and providing services to preschool children who are handicapped is critical to assuring that these children are assisted early in life so that their handicapping conditions do not delay their educational development.’ (US Code, Cong & Admin News, 1975, vol 2, p 1442.) (See Education Law, § 4408 'Statement of legislative intent and purposes’, where the New York Legislature also recognized the importance of the early detection of handicapping conditions in children.)” (Matter of J. F., supra, at 449.)
Having determined that early detection and treatment of *978 handicapping conditions are legislatively favored, the question then becomes: does the State mandate any specific tests or even offer any specific guidelines to make the determination?
Education Law § 4402 (1) (b) (3) (a) states, as related to committees on special education, that the committee is to review and evaluate all relevant information "including the results of a physical examination * * * and, where determined to be necessary by a school psychologist, an appropriate psychological evaluation performed by a qualified private or school psychologist, and other appropriate assessments as necessary to ascertain the physical, mental, emotional and cultural-educational factors which may contribute to the suspected or identified handicapping condition”.
8 NYCRR 200.4 sets out procedures for referral, evaluation, individualized education program (IEP) development, placement and review. In subdivision (b) (1) of that section (8 NYCRR 200.4 [b] [1]), entitled individual evaluation, the committees are instructed upon referral of an individual, to initiate an individual evaluation at no cost to the parent, to include a physical examination, psychological evaluation, if deemed necessary, a social history, and "other appropriate assessments or evaluations as necessary to ascertain the physical, mental and emotional factors which contribute to the suspected disabilities”.
Individual evaluation is defined in section 200.1 (v) (8 NYCRR 200.1 [v]) as "any procedures, tests or assessments used selectively with an individual student * * * and other appropriate assessments or evaluations as may be necessary to determine whether a student has a disability and the extent of his/her special education needs”.
In a further definition (8 NYCRR 200.1 [ac]) preschool students with disabilities are specifically addressed. "Eligibility as a preschool student with a disability shall be based on the results of an individual evaluation * * * not dependent on a single procedure, and administered by a multidisciplinary team in accordance with all other requirements as described in section 200.4 (b) (1) through (4) of this Part.”
Albeit not in effect at the time of this petition, but nonetheless pertinent to the ultimate issue herein, the said subdivision (ac) (1) (ii) lists criteria for determining if a preschool child has a disability, this criteria to be employed subsequent to July 1, 1993. One of the "eligibility” standards which is a sole determinative of disability is that the child shall be found *979 to have a disability if he/she suffers visual impairment. Section 200.1 (am) (13) reads as follows: "[a] student with a visual disability which, even with correction, adversely affects a student’s educational performance. The term includes both partially seeing and blind students.”
Finally, again although not effective until July 1, 1993, it is very relevant to the instant case as pointed out immediately above, that the New York State Legislature has enacted title II-A of article 25 of the Public Health Law entitled Early Intervention Program for Infants and Toddlers with Disabilities and Their Families (L 1992, ch 428).
A review of the legislative findings pertinently notes the need for early detection and treatment due to "the appearance of new disabilities and risk factors, the emergence of new technologies and alterations in family structure and workforce criteria necessitate the development of a more comprehensive service system that enhances the potential of all infants and toddlers with disabilities to develop into adults who are integrated into the workforce and community.”
By passage of this act the Legislature hopes in part to "(1) enhance the development of infants and toddlers with disabilities and minimize their potential for developmental delay;” and "(2) enhance the capacity of families to meet the special needs of their infants and toddlers with disabilities” (L 1992, ch 428).
Of special note, relevant to the instant case, is the Legislature’s determination that establishment of the program recognizes "the essential role of families in planning and implementing services for their infants and toddlers”. In its findings the Legislature states: "This program will provide for a variety of services that will enhance the capacity of families to meet the developmental needs of their infants and toddlers with disabilities” (L 1992, ch 428).
In this case the court notes that the assessment was performed by a multidisciplinary team consisting of a teacher in early intervention, a physical therapist, an occupational therapist and a speech pathologist. Their testimony was that based on their observations of the child on two separate days and upon information supplied by the child’s mother (who testified herself that she did not know much about how to help her child, but wanted to learn as much as possible from these experts to assist him in having every advantage possible in his future life) that they determined that at the age of 7 Vi weeks *980 he suffered from developmental delay and that he would benefit from early intervention services. The members of that team each testified extensively as to how they arrived at that determination based on their individual expertise and knowledge of this child’s condition as well as the mother’s input and their observation of the child. One of the stated goals of the services, comparatively relevant to the now published goals of the Early Intervention Act, was to assist the family in helping the child develop by providing training and knowledge which they could then employ to avoid further developmental delays.
As earlier stated herein the essential question presented to this court is whether this child "appears to the court to be in need of special educational services”.
Although the County’s position is certainly understandable (that it seems difficult to comprehend why a 7 Vi-week-old child, albeit blind, could be said to need services costing approximately $8,000 for the school year without a more thorough evaluation and comparison to a normative population to compare development with children of a similar age group) when examined in light of the very relevant statutory and case law which has been discussed above, it is clear that respondent’s argument does not reach a sufficiently strong degree as to convince the court that the instant child did not need special services even at that age.
Clearly, even at the time of this petition, the intent of the law was to identify those preschool children with handicapping conditions early on and to provide special services to them. Neither the statutes nor the official regulations set out any specific tests which were to be used in early identification and assessment of preschoolers with handicapping conditions, the code stating only that an individual evaluation consisted of any procedures, tests, or assessments used selectively with an individual student or other appropriate assessments or evaluations as may be necessary. This court, in light of those nebulous guidelines, without more at this time would be loathe to substitute its own inexpert knowledge to contradict the multidisciplinary team’s conclusion which, in this court’s estimation, as well as that of the more persuasive testimony of Sandra Gapin, Ph.D. (who testified that with a blind child of this age the determination of developmental delay would depend more on clinical assessment and judgment based on general knowledge and observation of the infant and accepted studies of different development of blind children from non-blind children and who, based on a review of the team’s *981 assessments, testified that this child was developmental^ delayed in contrast to David Coron, Ph.D. who testified that even had the advocated tests been pursued, the child could, even at that age, have been developmentally delayed and in need of services) is more in line with the intent of the State Legislature as regards handicapped children. This is even more the case when it is observed that the Legislature enacted title II-A of article 25 of the Public Health Law — the Early Intervention Program for Infants and Toddlers with Disabilities and Their Families (L 1992, ch 428, eff July 1,1993) — incorporating the avowed goals of early detection, early provision of special services and assistance to the child as well as to the family to avoid developmental delays, and which, most cogently, specifically sets out as a sole and single criteria for provision of services to preschoolers, the fact of being blind.
The objections of the respondent County of Herkimer are therefore dismissed and the County is ordered to approve the petition providing services for this infant.